1

2

3

4

5

6

7

**FILED**
CLERK, U.S. DISTRICT COURT

**10/4/2023**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___JB___ DEPUTY

8

9

10

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>RYAN WRIGHT,<br>  aka "Ryan Petetit,"<br><br>      Defendant. | CR No. 2:23-cr-00492-PA<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 1519: Falsification of Records; 18 U.S.C. § 1503: Obstruction of Justice; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

A.   DEFENDANT WRIGHT, DEVELOPMENT COMPANY 1, AND CO-CONSPIRATOR 1

1.   Defendant RYAN WRIGHT, also known as "Ryan Petetit," was a Managing Member of Development Company 1, a development company located in the City of San Luis Obispo ("City") in the Central District of California.  Defendant WRIGHT also served as Development Company 1's Chief Executive Officer until December 1, 2015. Development Company 1 had multiple projects in the Central District

28

of California, including in the City and San Luis Obispo County

("County").

2.    Co-Conspirator 1 was an attorney with a private law firm

specializing in real estate and land use in the County and City.  Co-

Conspirator 1's law practice represented clients who needed land use

permits from the County.  Co-conspirator 1 was also a Managing Member

of Development Company 1 and formed Development Company 1 in 2012.

B.    SAN LUIS OBISPO COUNTY

3.    The County was a local government that every calendar year

between 2014 and 2017 received benefits in excess of $10,000 under a

Federal program involving a grant, contract, subsidy, loan,

guarantee, insurance, and other forms of Federal assistance.

4.    The County was governed, in part, by its Board of

Supervisors, which adopted legislation, adjudicated issues, held

public hearings, set hearing agendas, and set policy in the County.

5.    The Board of Supervisors was comprised of five members,

each of whom represented a district within the County.  Each district

elected its own supervisor to represent it.

6.    County Supervisor 1 represented the district that included

a majority of the City's geographical region and population.  County

Supervisor 1 voted on matters appearing before the County Board of

Supervisors, including matters that affected Development Company 1

and others seeking permits, and had influence over matters occurring

within the County, including in the City and in the City's

departments and commissions.

7.    To provide transparency and accountability as an elected

official, California Political Reform Act, California Government Code

Section 81000, et seq., required County Supervisor 1 to file a

Statement of Economic Interest, also known as a Form 700.  Form 700s required elected officials to disclose on an annual basis income, investments, and gifts received by the elected official, among other financial interests.  Form 700s were required to be filed annually by April of the following calendar year.

8.   County Supervisor 1 was also the sole Managing Member of Consulting Company 1, which was formed on July 10, 2014.  According to California Secretary of State filings, Consulting Company 1's purpose was providing "consulting services."

C.   CITY OF SAN LUIS OBISPO

9.   The City was a local government that every calendar year between 2014 and 2017 received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other forms of Federal assistance.

10.   The City was governed, in part, by its City Council, which adopted legislation, adjudicated issues, including issues related to land development, held public hearings, set hearing agendas, and set policy in the City.

11.   The City Council was comprised of four City Council members and a Mayor, all of whom were elected at large by the City's registered voters.

12.   The City Manager was employed by the City and responsible for the City's day-to-day operations for the period of 2010 to 2017.  During 2014 to 2016, the City Manager had meetings approximately once a month with County Supervisor 1 where they would discuss issues related to the City and County.

13.   The Community Development Director was employed by the City and responsible for, among other things, overseeing the issuance of

permits, design review, and providing input on plans for building developments within the City during 2014 through August 2015.  On or about August 2015, the Community Development Director was promoted to Assistant City Manager and Interim Finance and Information Technology Director.

14.   To provide transparency concerning paid lobbyists and consultants' activities within the City, City Municipal Code Section 2.64, et seq., required registration for "Municipal Advocates," individuals who received compensation to advocate with City officials and employees regarding legislative or other discretionary City decisions.  Public officials acting in their official capacity were exempted from registering as Municipal Advocates.  County Supervisor 1 never registered as a Municipal Advocate.

D.   THE COMMISSIONS

15.   The City's Architectural Review Commission ("ARC") was responsible for establishing architectural guidelines and rules on the design of new construction and major commercial developments. The ARC was comprised of seven commissioners appointed by the City, including ARC Commissioner 1.

16.   The City's Cultural Heritage Commission ("CHC") was responsible for overseeing programs aimed at preserving the City's historic and architecturally significant buildings and locations. The CHC was comprised of seven members appointed by the City.

17.   The Airport Land Use Commission ("ALUC") was an independent body of seven members created in compliance with the California Aeronautics Act.  The ALUC prepared and adopted land use plans for each airport within its jurisdiction and reviewed actions proposed by

local cities and counties that would affect land uses within the vicinity of airports.

E.    THE FEDERAL INVESTIGATION

18.   On March 11, 2020, Federal Bureau of Investigation ("FBI") special agents executed search warrants at County Supervisor 1's home and his County office.  During that same month, a local newspaper publicized the fact that the FBI had executed search warrants at County Supervisor 1's home and office.

19.   On April 23, 2020, FBI special agents interviewed Co-Conspirator 1 concerning the corruption investigation.

20.   On April 29, 2020, FBI special agents interviewed defendant WRIGHT.

21.   On August 17, 2022, Co-Conspirator 1 accepted service of a federal grand jury subpoena directed to Development Company 1 for, among other things, records related to payments to County Supervisor 1's Consulting Company 1.

22.   These Introductory Allegations are incorporated into each count of this Indictment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT ONE

[18 U.S.C. § 371]

A.   OBJECTS OF THE CONSPIRACY

23.   Beginning on a date unknown and continuing until in or around May 23, 2017, in San Luis Obispo County, within the Central District of California, defendant RYAN WRIGHT conspired with Co-Conspirator 1, County Supervisor 1, and others known and unknown to the Grand Jury, to knowingly and intentionally commit offenses against the United States, namely, bribery concerning programs receiving federal funds, in violation of Title 18, United States Code, Section 666(a)(2), and wire fraud, through the deprivation of honest services of a County official, in violation of Title 18, United States Code, Sections 1343 and 1346.

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

24.   The objects of the conspiracy were to be accomplished, in substance, as follows:

        a.   In exchange for official acts by County Supervisor 1 to benefit defendant WRIGHT and Co-Conspirator 1, defendant WRIGHT would give, offer, and agree to give financial benefits to County Supervisor 1, including but not limited to money and gifts that ultimately totaled over $95,000 in value.

        b.   County Supervisor 1 would agree to perform, and would perform, official acts, including advocating for Development Company 1's projects and prospective projects with the City and voting for Development Company 1's projects in the County.

        c.   Defendant WRIGHT, Co-Conspirator 1, and County Supervisor 1 would disguise, conceal, and cover up the bribes

6

provided to County Supervisor 1.  Defendant WRIGHT and Co-Conspirator 1 would create Consulting Company 1 to funnel payments to County Supervisor 1 and thereby conceal the payments from the public and City official's knowledge.  County Supervisor 1 would provide false information on his publicly-filed Form 700s.

C.   <u>OVERT ACTS</u>

25.  In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant WRIGHT, Co-Conspirator 1, County Supervisor 1, and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts within the Central District of California, and elsewhere, including the following:

**The Formation of Consulting Company 1**

<u>Overt Act No. 1:</u>   On June 24, 2014, in a text message exchange, defendant WRIGHT and County Supervisor 1 discussed creating a separate entity to pay County Supervisor 1 for his work for Development Company 1.  During this discussion, defendant WRIGHT told County Supervisor 1 that Co-Conspirator 1 "wants to protect all three of us" "[a]nd put[ting] a gag order on all three of us [is a] good idea[]."  Defendant WRIGHT warned County Supervisor 1 that "[l]oose lips sink ships."

<u>Overt Act No. 2:</u>   On July 9, 2014, at the request of defendant WRIGHT, a Development Company 1 employee sent an email to an assistant at Co-Conspirator 1's law firm and asked her to file the paperwork for Consulting Company 1, naming County Supervisor 1 as the managing member and naming Co-Conspirator 1 as the agent for service of process.

///

**Defendant WRIGHT's First Bribe Payments and Benefits to County Supervisor 1**

Overt Act No. 3:    On July 14, 2014, in a text message exchange, defendant WRIGHT told County Supervisor 1 that Development Company 1 would pay County Supervisor 1 $5,000 up front and $1,700 a month thereafter, and would provide County Supervisor 1 with a leased car from a Volvo dealership using Development Company 1's funds.

Overt Act No. 4:    On July 14, 2014, in a text message exchange, County Supervisor 1 reported to defendant WRIGHT that he had already spoke to one ARC member.  During the same conversation, County Supervisor 1 explained to defendant WRIGHT that he was "going to golden ticket you to all the people and places you need to be with/at."

Overt Act No. 5:    On July 14, 2014, in a text message exchange, County Supervisor 1 told defendant WRIGHT that he liked the idea of Consulting Company 1 paying him because he and defendant WRIGHT and Co-Conspirator 1 could keep their arrangement "private" by only disclosing Consulting Company 1 on his Form 700 disclosure form.

Overt Act No. 6:    On July 16, 2014, in a text message exchange, County Supervisor 1 reported to defendant WRIGHT that he just finished a meeting with the City Manager and discussed the 590 Marsh Street parcel (the "Marsh project"), which would later become part of the larger San Luis Square Project.  County Supervisor 1 told defendant WRIGHT: "It can happen."

Overt Act No. 7:    On July 19, 2014, after agreeing to accept a car allowance paid for by defendant WRIGHT, County Supervisor 1 leased a 4-door Volvo Wagon valued at $43,020.

1    <u>Overt Act No. 8:</u>   On July 21, 2014, during the ARC meeting

2    conducting a "conceptual review" of the Marsh project, County

3    Supervisor 1 addressed the ARC after a local neighborhood group

4    criticized the project as too tall and contrary to the City's design

5    guidelines.  After indicating that he worked in the County building,

6    County Supervisor 1 responded to the project's critics by saying "we

7    don't want to stifle projects by chopping off floors . . . . I assume

8    the folks from [Development Company 1] want as much input as possible

9    to make this something to be proud of."  At no time during this

10    meeting did County Supervisor 1 disclose his financial arrangement

11    with defendant WRIGHT, Co-Conspirator 1, and Development Company 1.

12    <u>Overt Act No. 9:</u>   On July 21, 2014, after County Supervisor 1

13    addressed the ARC, County Supervisor 1 forwarded an email to

14    defendant WRIGHT that County Supervisor 1 received from ARC

15    Commissioner 1, which spoke favorably about the Marsh project and

16    County Supervisor 1: "Nice to see you in the room tonight. . . that

17    [Marsh] project has great promise."  In the forwarded email to

18    defendant WRIGHT, County Supervisor 1 wrote: "Just so you see the

19    value of my help....(Don't pass on)."

20    <u>Overt Act No. 10:</u>   On July 24, 2014, three days after the

21    hearing on the Marsh project, County Supervisor 1 negotiated a $2,500

22    check from Development Company 1's Bank of America account.  The

23    check was made payable to County Supervisor 1 or Consulting Company 1

24    and had the memo line of "Invoice # 101 – Retainer."  The check bore

25    the signature of "Ryan Petetit [defendant WRIGHT]."

26    <u>Overt Act No. 11:</u>   On August 22, 2014, County Supervisor 1

27    opened a Bank of America account in the name of Consulting Company 1

28    and used a $2,500 check payable to Consulting Company 1 that

defendant WRIGHT caused to be made from a company owned by a Development Company 1 investor.  The check was dated July 31, 2014, and had the memo line of: "Invoice #101 – Retainer for 590 Marsh Nipomo M."

**Consulting Company 1's "Operating Agreement" and Trip to San Francisco to Watch County Supervisor 1's Favorite Baseball Team**

Overt Act No. 12:   On September 5, 2014, County Supervisor 1 deposited a $6,400 check from Development Company 1's Bank of America account into Consulting Company 1's Bank of America account.  The check was dated September 5, 2014 and made payable to County Supervisor 1 or Consulting Company 1.  The check bore the signature of "Ryan Petetit [defendant WRIGHT]."

Overt Act No. 13:   On September 25, 2014, County Supervisor 1 sent an email to defendant WRIGHT and Co-Conspirator 1 as well as Development Company 1 telling them that his attorney had reviewed the proposed operating agreement and suggested certain restrictions, including that County Supervisor 1 would "disqualify himself from voting on any matters before him that do or could pertain to [Development Company 1]" and County Supervisor 1 "shall not appear on behalf of [Development Company 1] before any commissions or Boards in SLO County or any of its cities."

Overt Act No. 14:   On September 26, 2014, Co-Conspirator 1 responded to County Supervisor 1's September 25, 2014 email and disagreed with County Supervisor 1's attorney's proposed restriction on County Supervisor 1 speaking on Development Company 1's behalf as a private citizen before a "local architectural review board for the City of SLO."  Co-Conspirator 1 proposed re-writing the restriction so that County Supervisor 1 could appear before commissions or boards

in the City on Development Company 1's behalf so long as he did not
do so in his capacity as a supervisor or County representative.
Specifically, Co-Conspirator 1's rewritten provision read: "[County
Supervisor 1] shall not appear on behalf of [Development Company 1]
before any commissions or Boards OF SLO County or AS A SUPERVISOR OR
REPRESENTATIVE OF THE COUNTY WITH RESPECT TO any of its cities."
Defendant WRIGHT and a Development Company 1 employee were copied on
the email.

Overt Act No. 15:   On October 8, 2014, defendant WRIGHT and
County Supervisor 1 caused a check for $4,950 from Development
Company 1's Bank of America account to be deposited into Consulting
Company 1's Bank of America account.  The check was dated October 7,
2014, and was made payable to County Supervisor 1 or Consulting
Company 1.  The check bore the signature of "Ryan Petetit [defendant
WRIGHT]."

Overt Act No. 16:   On October 14, 2014, in a text message
exchange, defendant WRIGHT told County Supervisor 1 he could make
$250,000 per year and have "[o]n going income for ever."  County
Supervisor 1 told defendant WRIGHT that "I think [Co-Conspirator 1]
is starting to understand my value," a statement with which defendant
WRIGHT agreed.

Overt Act No. 17:   On October 16, 2014, defendant WRIGHT, using
Development Company 1's funds, flew himself and County Supervisor 1
on a semi-private jet to San Francisco, California, to watch Game 5
of Major League Baseball's National League Championship Series
between the San Francisco Giants and the St. Louis Cardinals.
Defendant WRIGHT, using Development Company 1's funds, also paid for
his and County Supervisor 1's premium seat, which were in the first

row along the third baseline and cost approximately $1,032 per ticket.  On October 16, 2014, defendant WRIGHT, using Development Company 1's funds, paid at least $754.58 for hotel rooms for himself and County Supervisor 1 at a luxury hotel in San Francisco, California.

Overt Act No. 18:  On November 7, 2014, defendant WRIGHT and County Supervisor 1 caused a check for $4,950 from defendant Development Company 1's Bank of America account to be deposited into Consulting Company 1's Bank of America account.  The check was dated November 6, 2014, and made payable to County Supervisor 1 or Consulting Company 1.  The check bore the signature of "Ryan Petetit [defendant WRIGHT]."

Overt Act No. 19:  In a letter dated December 15, 2014, to a Development Company 1 investor, a Development Company 1 employee asked for reimbursement related to Consulting Company 1.  The same employee explained the charges included reimbursement for a laptop and cellphone because Development Company 1 was Consulting Company 1's "only client and these items are used exclusively for" use on Development Company 1's projects.

Overt Act No. 20:  On December 16, 2014, at the County's Board of Supervisors Meeting, County Supervisor 1 voted via consent agenda to approve the final map for Development Company 1's Toad Creek Homes, LLC project, a proposed subdivision of 26 residential lots and two open space lots in Templeton, California.

Overt Act No. 21:  On December 18, 2014, defendant WRIGHT and County Supervisor 1 caused two checks from Development Company 1's Bank of America account made payable to Consulting Company 1 to be deposited into Consulting Company 1's Bank of America account.  One

check was for $4,950 and had "Inv # 6,7,8,9, 11" in the memo line. The other check was for $3,084.68 and had "Reimbursements" in the memo line.  Both checks were dated December 17, 2014 and bore the signature of "Ryan Petetit [defendant WRIGHT]."

Overt Act No. 22:   On December 31, 2014, defendant WRIGHT and County Supervisor 1 caused a check for $4,950 from Development Company 1's Bank of America account made payable to Consulting Company 1 to be deposited into Consulting Company 1's Bank of America account.  The check bore the signature of "Ryan Petetit [defendant WRIGHT]," and its memo line read "Inv. # 24, 25, 26, 27, 28."

**County Supervisor 1 Conceals His Connection to, and Payments From, Development Company 1**

Overt Act No. 23:   On February 2, 2015, defendant WRIGHT and County Supervisor 1 caused a check for $4,950 from Development Company 1's Bank of America account made payable to Consulting Company 1 to be deposited into Consulting Company 1's Bank of America account.  The check bore the signature of "Ryan Petetit [defendant WRIGHT]" and its memo line read "Consulting services."

Overt Act No. 24:   On February 23, 2015, in a text message exchange, County Supervisor 1 told defendant WRIGHT he planned to describe Consulting Company 1's activities on his Form 700 "as coaching and speechwriting" and "[f]or you rather than all of [Development Company 1]."  County Supervisor 1 asked defendant WRIGHT if he was "ok" with it.  Defendant WRIGHT asked for a few days so he could check "legal."

Overt Act No. 25:   On March 15, 2015, in a text exchange, defendant WRIGHT told County Supervisor 1 that it "[l]ooks like Avila will be another [County Supervisor 1's initials] with [Development

Company 1]." When asked by County Supervisor 1 which Avila project, defendant WRIGHT told him "Avila ranch" and that the current owner wanted to sell to him.

Overt Act No. 26: On March 19, 2015, in an email from a Development Company 1 employee to a Development Company 1 investor, copying defendant WRIGHT, the employee asked for two checks, each for $2,500, made payable to County Supervisor 1's re-election campaign. Defendant WRIGHT responded in an email to a Development Company 1 investor only and wrote that "[w]e're giving [County Supervisor 1] 25k In total this time around the other funds are coming from us personally or one other entity. If we loose [sic] him it's bad for us Down town."

Overt Act No. 27: On March 20, 2015, in a text message exchange, County Supervisor 1 told defendant WRIGHT that he had "been smoothing the way with CalTrans" concerning the Avila Ranch project, which, like the ALUC, had opposed the project. Defendant WRIGHT responded that "I'm not doing Avila ranch without u in office."

Overt Act No. 28: On March 26, 2015, County Supervisor 1 filed his Form 700 disclosure for 2014, which disclosed that he made between $10,001 and $100,000 from working for Consulting Company 1, which he described as a business that did "[w]riting, [e]diting, [c]oaching" and labeled his position as "consultant." County Supervisor 1 omitted from the Form 700 gifts that were required to be reported, including the flight to San Francisco, the ticket to the playoff baseball game, and the hotel stay that cost at least $1,409- all paid for by defendant WRIGHT with Development Company 1's funds.

Overt Act No. 29: On April 1, 2015, in a text message exchange discussing what the City Manager wanted in order to support the Avila

Ranch project, County Supervisor 1 told defendant WRIGHT that "i think i can help with [City Manager] because she needs me right now." County Supervisor 1 then asked if defendant WRIGHT needed anything else to which defendant WRIGHT responded he just "need[ed] the vote."

Overt Act No. 30:   On May 4, 2015, defendant WRIGHT caused the transfer of $10,000 from Development Company 1's Bank of America account to Consulting Company 1's Bank of America account.

Overt Act No. 31:   On May 13, 2015, in a text message exchange, defendant WRIGHT told County Supervisor 1 that defendant WRIGHT needed to meet with San Luis Obispo City Councilmembers 1 and 2 because of an upcoming ARC meeting.

Overt Act No. 32:   On May 26, 2015, in a text message exchange, County Supervisor 1 told defendant WRIGHT that City Councilmember 2 liked defendant WRIGHT and that County Supervisor 1 told City Councilmember 2 that defendant WRIGHT "contributed to the get out the vote effort to help him get elected.  i am your friend and consigliere."  County Supervisor 1 went on to write "you never say anything, that's my job," and "i let the elected know who is helping."

**Defendant WRIGHT, Co-Conspirator 1, and Development Company 1 Pay County Supervisor 1 $15,000 for ARC and CHC "Approval"**

Overt Act No. 33:   On June 10, 2015, defendant WRIGHT and County Supervisor 1 caused a check for $10,000 from Development Company 1's Bank of America account made payable to Consulting Company 1 to be deposited into Consulting Company 1's Bank of America account.  The check bore the signature of "Ryan Petetit [defendant WRIGHT]," and its memo line read "May & June consulting services."

15

Overt Act No. 34:   On June 23, 2015, in a text message exchange, defendant WRIGHT told County Supervisor 1 that July 13 was the date ARC would review the San Luis Square project and that County Supervisor 1 needed to "[g]et ready."

Overt Act No. 35:   On July 4, 2015, in a text message exchange, County Supervisor 1 told defendant WRIGHT that he was meeting with ARC Commissioner 1 the following day and that County Supervisor 1 would get ARC Commissioner 1 to take the lead on the conversation concerning the San Luis Square project at the upcoming joint ARC-CHC meeting.

Overt Act No. 36:   On July 5, 2015, in a text message, County Supervisor 1 reported to defendant WRIGHT that he spent an hour with ARC Commissioner 1 who "loves your stuff."

Overt Act No. 37:   On July 6, 2015, in a text message exchange, County Supervisor 1 wrote to defendant WRIGHT that he was meeting with Community Development Director for lunch and asked "[o]ther than obvious stuff, anything else I need to push?"  Defendant WRIGHT told County Supervisor 1 he would call County Supervisor 1 later.

Overt Act No. 38:   On July 11, 2015, in a text message exchange, County Supervisor 1 told defendant WRIGHT that City staff and some ARC commissioners and City Council "friends" suggested that County Supervisor 1 not attend the upcoming July 13, 2015 joint ARC and CHC meeting discussing the San Luis Square Project and instead "work behind the scenes" to advance the San Luis Square Project. Defendant WRIGHT told County Supervisor 1 he "disagree[d]" and that "[t]hose arc folks eat from your hands" and listed three ARC commissioners who heard County Supervisor 1 speak about the Marsh Project at the July 21, 2014 ARC meeting.

16

<u>Overt Act No. 39:</u>   On July 12, 2015, in a text message exchange, County Supervisor 1 told defendant WRIGHT he would attend the July 13, 2015 ARC meeting but that he was "[n]ot allowed to speak" but he would be "working behind the scenes. Ok!"   County Supervisor 1 further explained that he was not "[l]egally" permitted to testify in support of Development Company 1's projects and cited to the restriction his attorney suggested to include in the operating agreement.   County Supervisor 1 told defendant WRIGHT "[t]hat's why I am working behind the scenes and will work the room during the hearing."   Defendant WRIGHT persisted in his efforts to get County Supervisor 1 to address the ARC and CHC when they considered the San Luis Square Project and suggested that County Supervisor 1 could speak in favor of "this kind of project" but not specifically endorse the San Luis Square Project.   Defendant WRIGHT then wrote: "I'm just being honest [Co-Conspirator 1] and my partners have been counting big time on your voice in the hearing."

<u>Overt Act No. 40:</u>   On July 13, 2015, notwithstanding that the previous day County Supervisor 1 had previously stated he was "[n]ot allowed to speak," he addressed the joint ARC and CHC meeting considering the conceptual design of Development Company 1's San Luis Square project.   County Supervisor 1 referenced his role on the Economic Development Commission and his work with the San Luis Obispo City council and council staff.   County Supervisor 1 described the need to provide additional urban housing for new tech workers before saying "I represent 62% of the City in the County."   County Supervisor 1 concluded by saying that the San Luis Square Project was the solution to the City's housing shortage and that he "hope[d]" the

ARC and CHC would "work with the project applicants to find ways to make this work economically."

Overt Act No. 41:   On July 13, 2015, during a text message exchange, defendant WRIGHT reported to County Supervisor 1 that ARC Commissioner 1 was "taking a lead" and voiced strong support for the San Luis Square Project and its four stories.  As the commissioners continued to speak in favor of the project during the hearing, defendant WRIGHT asked County Supervisor 1 if he "drug[ged] these ppl."  Later, County Supervisor 1 bragged that the "[t]hat joint commission listened to every word I spoke . . . . [a]nd nodded."  County Supervisor 1 reviewed for defendant WRIGHT the ARC members to whom he advocated in support of the project.  Defendant WRIGHT responded "you are a huge [f]ucking help" to which County Supervisor 1 replied: "[n]obody wants to fuck with their county supervisor when it's me."

Overt Act No. 42:   On July 13, 2015, after County Supervisor 1 asked defendant WRIGHT if he could pay Consulting Company 1's retainer for July and August, defendant WRIGHT told County Supervisor 1 "[d]ude you get a bonus" and promised him an additional $15,000.

Overt Act No. 43:   On July 14, 2015, the day after County Supervisor 1 addressed the joint ARC CHC meeting concerning Development Company 1's San Luis Square Project, County Supervisor 1 sent Co-Conspirator 1 the following text messages: "I spoke with everyone I needed to and it worked," "[ARC commissioner 1] told me my comments made the difference with ARC," and "[s]o did [a CHC member] with CHC."

Overt Act No. 44:   On July 14, 2015, County Supervisor 1 sent an email to defendant WRIGHT, copying an employee at Development

Company 1, with an attached invoice that stated, "San Luis Square approval at ARC & CHC: BONUS" with the amount of $15,000 under it, the amount of $4,900 for "July invoice," and a total amount due of $19,900.

Overt Act No. 45:   On July 14, 2015, defendant WRIGHT forwarded County Supervisor 1's July 14, 2015 email and invoice to Co-Conspirator 1 and wrote that he gave County Supervisor 1 "a friendly bonus" of $15,000 and that County Supervisor 1 was a "difference maker last night or one of them!"

Overt Act No. 46:   On July 20, 2015, in a text message exchange, County Supervisor 1 told defendant WRIGHT that the City's Assistant City Attorney told County Supervisor 1's legislative aide that "the big dog showed up and got the biggest downtown project approved" and that the Assistant City Attorney told the legislative aide that her boss, County Supervisor 1, was the "big dog" who "knocked it out of the park."

Overt Act No. 47:   On August 5, 2015, County Supervisor 1 deposited a $25,000 check from Development Company 1's Bank of America account made payable to Consulting Company 1 into Consulting Company 1's Bank of America account. The check bore the signature of "Ryan Petetit [defendant WRIGHT]," and its memo line read "July & August consulting servies [sic] plus bonus."

Overt Act No. 48:   On March 30, 2016, County Supervisor 1 filed his Form 700 disclosure for calendar year 2015, and despite that he was paid approximately $49,950 from Development Company 1 via Consulting Company 1 in 2015, he failed to report any outside income received from either entity as required.

**Defendant WRIGHT and Co-Conspirator 1 Funnel $10,000 to County Supervisor 1 for Votes Favoring Development Company 1**

Overt Act No. 49:   On August 26, 2016, in a text exchange, defendant WRIGHT told County Supervisor 1 that his project in Templeton, California, an unincorporated part of the County, was "done and approved."

Overt Act No. 50:   On August 30, 2016, in a text message exchange, defendant WRIGHT told County Supervisor 1 he would get him a campaign donation of $10,000 from his "buddies wife" before providing the name of a woman who was married to a contractor working with Development Company 1.

Overt Act No. 51:   On September 4, 2016, in a text message exchange, County Supervisor 1 asked defendant WRIGHT if he could count on his financial support to which defendant WRIGHT responded that he was "funneling money" to County Supervisor 1 through another person and that he told Co-Conspirator 1 he planned to give County Supervisor 1 $10,000.

Overt Act No. 52:   On September 12, 2016, in a text message exchange, defendant WRIGHT asked if County Supervisor 1 was "ok" with having to explain receiving a check from the wife of a contractor working with Development Company 1.  County Supervisor 1 told defendant WRIGHT that it was "not gonna be a problem" but he "need[s] the 10k."

Overt Act No. 53:   On October 14, 2016, in response to Co-Conspirator 1's request for a telephone call, Co-Conspirator 1 and County Supervisor 1 had a five-minute conversation.

Overt Act No. 54:   On October 18, 2016, at a County Board of Supervisors meeting, County Supervisor 1 voted via consent agenda to

20

approve the final map for Development Company 1's Las Tablas Villas project in Templeton.

Overt Act No. 55:   On November 3, 2016, in a text message, defendant WRIGHT told County Supervisor 1 that he was "closing up that deal in Templeton," an unincorporated area in the County of San Luis Obispo.

Overt Act No. 56:   On November 5, 2016, in a text message, defendant WRIGHT told County Supervisor 1 his check would not go to the campaign but directly to Consulting Company 1.

Overt Act No. 57:   On November 13, 2016, in a text message exchange, defendant WRIGHT told County Supervisor 1 that "I have that [Consulting Company 1] $ for u."  County Supervisor 1 asked "when? I'm desperate."

Overt Act No. 58:   On November 17, 2016, in a text message exchange, County Supervisor 1 wrote "$10,000!" to defendant WRIGHT, after he complained about his need for money.  County Supervisor 1 then clarified that the money would be paid to Consulting Company 1. Later that day, defendant WRIGHT asked for Consulting Company 1's Bank of America account.

Overt Act No. 59:   On November 18, 2016, in a text message, County Supervisor 1 asked defendant WRIGHT if he "[w]ant[ed] to buy my Volvo?" and told him the lease was coming due and he could not afford to buy it.

Overt Act No. 60:   On November 23, 2016, in a text message exchange, defendant WRIGHT told County Supervisor 1 that he should have the "funds."  After County Supervisor 1 expressed his gratitude, defendant WRIGHT responded: "You earned it."

<u>Overt Act No. 61:</u>   On November 23, 2016, defendant WRIGHT caused the transfer of $10,000 from Development Company 1's Bank of America account to Consulting Company 1's Bank of America account.

<u>Overt Act No. 62:</u>   On March 29, 2017, County Supervisor 1 filed his Form 700 disclosure for calendar year 2016 and despite that he was paid $10,000 from Development Company 1 via Consulting Company 1 in 2016, he failed to report any outside income from either entity as required.

<u>Overt Act No. 63:</u>   On May 23, 2017, the day after members of the CHC expressed concerns about the San Luis Square project, Co-Conspirator 1 sent County Supervisor 1 a text message indicating Development Company 1 had a "[t]ough night at CHC last night" and asked if County Supervisor 1 had time to talk.

COUNT TWO

[18 U.S.C. § 1519]

26.  On or about August 22, 2022, within the Central District of California, defendant RYAN WRIGHT, also known as "Ryan Petetit," in relation to and in contemplation of a matter within the jurisdiction of the Federal Bureau of Investigation, knowingly altered, falsified, and made a record with the intent to impede, obstruct, and influence the investigation and proper administration of that matter. Specifically, defendant WRIGHT altered, falsified, and made an Excel spreadsheet with entries claiming that Development Company 1 owed County Supervisor 1 $10,000 for work related to a project in Santa Barbara County.  In fact, as defendant WRIGHT then knew, the spreadsheet had been altered after learning of the FBI investigation to include references to the Santa Barbara project while the original document included no such references.

COUNT THREE

[18 U.S.C. § 1503]

27.  From on or about August 17, 2022 to on or about September 7, 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendant RYAN WRIGHT, also known as "Ryan Petetit," corruptly endeavored to influence, obstruct, and impede the due administration of justice.  Specifically, after Development Company 1 received a federal grand jury subpoena on or August 17, 2022 seeking records concerning payments to County Supervisor 1 and Consulting Company 1, defendant WRIGHT endeavored to influence, obstruct, and impede the federal investigation with falsified documentation and information regarding the purpose of Development Company 1's payments to County Supervisor 1 and caused that falsified documentation and information to be transmitted to the Federal Bureau of Investigation and United States Attorney's Office in response to the federal grand jury subpoena.

1                        FORFEITURE ALLEGATION

2              [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3        28.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Section 981(a)(1)(C) and Title 28, United States

7   Code, Section 2461(c), in the event of the defendant's conviction of

8   the offenses set forth in either of Counts One or Three of this

9   Indictment.

10       29.   The defendant, if so convicted, shall forfeit to the United

11  States of America the following:

12            (a)   All right, title and interest in any and all property,

13  real or personal, constituting, or derived from, any proceeds

14  traceable to any such offense; and

15            (b)   To the extent such property is not available for

16  forfeiture, a sum of money equal to the total value of the property

17  described in subparagraph (a).

18       30.   Pursuant to Title 21, United States Code, Section 853(p),

19  as incorporated by Title 28, United States Code, Section 2461(c), the

20  defendant, if so convicted, shall forfeit substitute property, up to

21  the total value of the property described in the preceding paragraph

22  if, as the result of any act or omission of the defendant, the

23  property described in the preceding paragraph, or any portion

24  thereof: (a) cannot be located upon the exercise of due diligence;

25  (b) has been transferred, sold to or deposited with a third party;

26  (c) has been placed beyond the jurisdiction of the court; (d) has

27  been

28  //

1   substantially diminished in value; or (e) has been commingled with
2   other property that cannot be divided without difficulty.

3

4                                          A TRUE BILL

5

6                                          _____
7                                          Foreperson

8
E. MARTIN ESTRADA
9   United States Attorney

10

11
MACK E. JENKINS
12  Assistant United States Attorney
Chief, Criminal Division
13
LINDSEY GREER DOTSON
14  Assistant United States Attorney
Chief, Public Corruption and
15  Civil Rights Section

16  THOMAS F. RYBARCZYK
Assistant United States Attorney
17  Public Corruption and Civil
Rights Section
18
DANIEL J. O'BRIEN
19  Assistant United States Attorney
Senior Litigation Counsel
20  Public Corruption and Civil
Rights Section

21

22

23

24

25

26

27

28