E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
Senior Litigation Counsel
THOMAS F. RYBARCZYK (Cal Bar No. 316124)
Assistant United States Attorney
BILLY JOE MCLAIN (Cal Bar No. 290682)
Assistant United States Attorney
Public Corruption & Civil Rights Section
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:  (213) 894-2468/8452/6702
        Facsimile:  (213) 894-0141
        E-mail:     daniel.obrien@usdoj.gov
                    thomas.rybarczyk@usdoj.gov
                    bmclain2@usdoj.gov

Attorneys for Applicant
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br>RYAN WRIGHT,<br><br>              Defendant. | No. 2:23-cr-00492-PA<br><br>OPPOSITION TO DEFENDANT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S DETENTION ORDER; MEMORANDUM OF POINTS AND AUTHORITIES |

    The United States of America, by and through its counsel of

record, the United States Attorney for the Central District of

California and Assistant United States Attorney Daniel J. O'Brien,

///

///

///

///

submits its opposition to Defendant's Application for Review of the Magistrate Judge's Detention Order.

Dated: May 28, 2024                    Respectfully submitted,

                                       E. MARTIN ESTRADA
                                       United States Attorney

                                       MACK E. JENKINS
                                       Assistant United States Attorney
                                       Chief, Criminal Division


                                        /s/ Daniel J. O'Brien
                                       DANIEL J. O'BRIEN
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   INTRODUCTION**

3

The order of detention by the U.S. Magistrate Judge Jean

4

Rosenbluth is supported by voluminous evidence and argument submitted

5

in connection with three bond hearings.  To become adequately

6

familiar with the proceedings below, the government recommends that

7

the court focus its review upon the following docket entries:

8

| File Date | Dkt | Description |
|---|---|---|
| 10/30/23 | 62 | Transcript: Detention Hearing |
| 12/28/23 | 42 | Government Proffer |
| 01/01/24 | 46 | Government Supplemental Proffer |
| 01/02/24 | 49 | Government Supplemental Proffer (under seal) |
| 01/02/24 | 63 | Transcript: 1st Detention Reconsideration Hearing |
| 01/17/24 | 65 | Government Revision to Proffer |
| 03/26/24 | 75 | Government Proffer |
| 03/27/24 | 79 | Government Supplemental Proffer |
| 04/01/24 | 88 | Transcript: 2nd Detention Reconsideration Hearing |

In this brief, the government summarizes the evidence and

responds to sundry points raised in the defendant's brief in support

of the instant application.

**II.   DEFENDANT PRESENTS AN ECONOMIC DANGER TO THE COMMUNITY**

The primary basis for the defendant's detention is that he

presents an economic danger to the community.  (Dkt 62, pp. 9-16; Dkt

63, pp. 55-57.)[1]

The defendant has been accused of investment fraud schemes

through multiple civil complaints filed by various business partners

going back to at least 2018, which reference events going back to

2013.  (Dkt 62, pp. 10 & 16; Dkt 75, p. 10.)  The defendant has been

---

[1] Page number references are to the pdf exhibits submitted in
tandem with the Appendix filed in accordance with the Court' Minute
Order.  Thus, page one of each exhibit is a cover page that
identifies the underlying docket number and original filing date.

aware of the government's investigation since April 2020.  (Defense Brief p. 2.)  In the face of these various attempts to interdict, punish, and deter his unlawful activity, defendant has repeatedly engaged in new crimes.  (Dkt 62, pp. 9-15; Dkt 63, pp. 55-57.)

For example, in February 2022, in response to a government proffer designed to encourage a pre-indictment resolution of the corruption matter, defendant obstructed the investigation by altering a document and presenting it to the government to falsely exonerate himself.  (Dkt 42, pp. 33-39.)[2]  Beginning in February 2022, defendant embarked upon a real estate investor fraud scheme in Texas.  (Dkt 42, pp. 39-47.)  By August 2022, defendant expanded that fraud by making numerous false representations with respect to the status of the Texas project in connection with a $24 million loan application.  (Dkt 42, pp. 47-57.)  In early February 2023, after the seller terminated the Texas real estate project and filed suit for breach of contract, defendant embarked on a credit card fraud scheme against his business partner, John Pena.  (Dkt 42, pp. 5-8.)  Beginning in late February 2023, after defendant procured a new purchase agreement for the Texas property, defendant resumed his fraud against the lender, by falsely representing amounts paid into the project and temporarily inflating the balance of a bank account offered in support of the loan.  (Dkt 42, pp. 47-57).  After the lender received a subpoena in connection with the government's investigation and cancelled the loan, defendant attempted to

---

[2] Defendant's willingness to obstruct is consistent with his previously offering to pay money to one of his domestic abuse victims so that she would not testify as to his pattern of domestic abuse. (Dkt 63, pp. 44-45.)

fraudulently procure a loan from another lender in which he conveyed similarly false information.  (Dkt 42, p. 57).

In sum, rather than be deterred by efforts to put a halt to his criminal activity, the defendant has engaged in incessant attempts to keep one step ahead of the government and has perpetrated further crimes.  Defendant's repeated frauds against numerous individuals and entities demonstrates that he is an incorrigible, confidence man who will continue to hurt innocent people if he is released prior to trial.

**III.  DEFENDANT PRESENTS A DANGER TO WOMEN**

The evidence demonstrates that defendant has repeatedly abused women.  Defendant pleaded guilty to five felony counts of domestic abuse against a former girlfriend.  (Dkt 65.)  His criminal history shows arrests for, and/or complaints of, domestic abuse involving two other women.  (Id., pp. 7-8.)  The circumstances of the incidents are particularly troubling in that they involve choking or grabbing the victim by the throat.  (Id.)  On one occasion, the victim was left unconscious.  (Id.)  A memorandum filed by California prosecutors prior to his pleas of guilty reveals additional incidents of domestic abuse that victims had not reported to the police.  (Dkt 42, pp. 151-178.)

The defense argues that defendant's prior instances of violence go back many years.  This contention ignores allegations raised by defendant's ex-wife, supported by photographs depicting bruises, that she was beaten by defendant in 2020.  (Dkt 52.)

**IV.  DEFENDANT IS A FLIGHT RISK**

Defendant's incorrigibility is also relevant to assessing the risk of flight.  Defendant has gone to extreme lengths to avoid

responsibility for his crimes.  His obstruction of that investigation indicates that he will do whatever is necessary to avoid consequences for his actions, and flight would be one such means to accomplish that goal.

Although the government is not privy to what the defendant has submitted to the Court regarding his income and assets, it is clear from orders issued by both the Magistrate Judge and this Court that defendant has, at least at some juncture, been unwilling to disclose his financial resources, has sufficient financial capacity to hire an attorney, and yet has declined to do so.  (See, e.g., Dkt 63, pp. 17-19 & 53.)  This concealment of assets should be a significant factor in evaluating the risk of flight.

There is also concrete evidence in support of the claim that defendant is hiding assets.  Defendant's fraudulent real estate transactions, which are the subject of various lawsuits, generated millions of dollars.  (See, e.g., Dkt 75, pp. 9-10.)  In 2022, defendant entered into an agreement with his unindicted co-conspirator, John Belsher, in which he agreed to pay expenses on behalf of Belsher.  To ensure repayment, the parties agreed to an arrangement through which defendant would become the beneficiary of Belsher's life insurance policies.  (Dkt 75, pp. 7-9 & 74-82.) Defendant then proceeded to pay premiums on the policies.  (Dkt 75, pp. 8 & 103-104.)  In that same agreement, defendant represented that he could personally provide $1,075,000 to settle some of the claims filed against himself and Belsher.  (Dkt 75, p. 76.)  In early 2023, defendant informed his business partner, John Pena, that he was concerned that if he accessed his own money, the government might identify the funds and seize them.  Defendant told Pena that he could

have one of his attorneys (who specializes in trusts) access $250,000. (Dkt 49.) In recorded prison call after his arrest, the defendant told his mother and brother that they could use that same attorney to access money. (Dkt 46, p. 16; Dkt 63, pp. 52-55.) That attorney declined to produce information in response to a subpoena, which necessitated an order by this Court to compel the production of documents. (Dkt 42, p. 10; Dkt 88, p. 26.) Notwithstanding a settlement agreement that entitled the defendant to received approximately $100,000 in September 2023, the defendant did not reveal such funds until six months later, when he offered them in support of his bond application.[3]

The defense has argued that defendant has been aware of the government's investigation for years and did not flee. (Defense brief, p. 21-22.) While this is true, at that time, the defendant was engaged in another tactic to defeat the government's case, which was to defraud people of money, use that money to hire attorneys, and then have those attorneys produce false evidence to thwart the investigation. (Dkt 42, pp. 33-39; Dkt 63, pp. 60-61.)

In the past, the government has agreed that the risk of flight could be mitigated if the defendant posted a sufficient bond with his own money. However, defendant's attempt to post such a bond was neither sufficient in amount nor, a discussed below, his own money, but rather the proceeds of fraud. (Dkt 75, pp. 9-14.)

---

[3] The lack of a stable address is also a factor for the Court to assess with respect to flight risk. The defendant changed his residence on two occasions just prior to his arrest, which necessitated a search warrant for cell site information and surveillance to determine his whereabouts. (Dkt 42, pp. 60-63.)

**V.    THE GOVERNMENT WAS ENTITLED TO A DETENTION HEARING**

The defense argues that the government was not entitled to a detention hearing because the court did not determine, as threshold matter, that defendant posed a serious risk of flight or obstruction of justice.

The defense argument in this regard was thoroughly aired and rejected in the second bond hearing.  (Dkt 63, pp. 16-18 & 43-47.) The court initially found that a detention hearing would have been warranted because defendant presented a serious risk of flight and that defendant had waived this argument because of his failure to raise the issue at the initial hearing.  (Dkt 63, pp. 16-18.)  The government pointed out that it had sought, and was entitled to, a detention hearing not only because of a serious risk of flight but also a serious risk that defendant would obstruct justice.  (Dkt 63, pp. 43-44; Dkt 3, p. 5.)  The government then pointed out that the risk of obstructing justice was obvious given that the defendant had been charged with two obstruction counts, the defendant had tried to pay off a witness in connection with his domestic abuse case, and a primary motive behind the various fraud offenses charged in the indictment was to procure attorneys who would assist the defendant's obstruction by providing the government with falsified documents and testimony.  (Dkt 63, pp. 43-47.)

**VI.   THE MAGISTRATE JUDGE WAS NOT MISINFORMED AS TO THE FACTS**

The defense claims that the record contains several misstatements of fact.  Specifically, it argues that the Magistrate Judge was misinformed as to defendant's criminal history and allegations that defendant had defrauded litigants in one of the civil fraud cases.

With respect to defendant's criminal history, the record reveals that the government argued reasonable inferences based upon the evidence submitted to the court, accepted defense proffers offered by the defense response, subsequently conducted a lengthy investigation as to defendant's criminal history, and submitted accurate information to the court to clarify and amend the factual record.

With respect to defendant's denials regarding the fraud committed against victim Jeff Chase, the government submitted detailed evidence that supports Chase's allegations.  The government stands by its position that Chase was defrauded and that the $100,000 offered by defendant in support of a bond represents the proceeds of that fraud.

## A.   The Magistrate Judge Was Correctly Informed Re Defendant's Criminal History

At the initial October 30, 2023 detention hearing, there were several uncertainties as to defendant's criminal history.  The Pretrial Service Report represented that the defendant did not have any prior felony convictions.  (Dkt 62, pp. 8-9.)  Upon inquiry by the Magistrate Judge, the Pretrial Services Officer represented that he was uncertain whether there was a felony conviction or not. (Id. at 8.)  The government proffered that the defendant did have a prior felony conviction, but the defense replied that it did not know. (Id. at pp. 8-9.)  The parties also disagreed as to whether the allegations of defendant's domestic abuse involved one woman or multiple women.  (Dkt 62, pp. 23-26.)  The government pointed out that defendant's sentence of 270 days incarceration was accompanied with a probationary period of five years.  (Id. at 26.)  The defense represented that defendant's probationary term was "early

terminated."  (Id.)

In connection with the second bond hearing, the government filed a table that summarized defendant's rap sheet as well as a trial brief filed by the state prosecution in the case that ultimately resulted in defendant's conviction which forth prior instances of defendant's violent conduct.  (Dkt 42, pp. 8-9 & 151-178.)  At the hearing, the defense took issue with the government's table "to make sure that it's not part of the record".  (Dkt 63, pp. 68-70.)  In particular, the defense took issue with three entries from the rap sheet that stated, "convicted, pled to other offense."  (Id. at 69.)  At the hearing, the government accepted the defense proffer.  (Id. at 70.)  The court accepted it as well.  (Id. at 70-71.)  Moreover, at the court's direction, the government spent approximately two weeks investigating defendant's criminal history, largely by obtaining prior arrest reports, and then filed a revised proffer with an amended table.  (Dkt 65.)

That revised proffer acknowledged that there was "no evidentiary support" for a probation violation.  (Dkt 65, pp. 9-10.)  It also made clear that the five-year probationary term was imposed as part of defendant's sentence imposed on July 10, 2019, that by November 15, 2021, defendant moved for an early termination of probation, and that on January 27, 2022, the court found that the probationary term was "previously expired/terminated by operation of law."  (Id.)

Consequently, the record below does not contain incorrect information with respect to defendant's criminal history, nor did the Magistrate Judge make its decision based upon misinformation in that regard.

1

2

**B.** <u>**Defendant Defrauded Jeff and Linda Chase & Offered the Proceeds of that Fraud as a Bond**</u>

3

4

5

6

7

8

9

10

11

12

13

14

15

The government is sensitive to the Court's stated intention not to accept evidentiary submissions not considered by the Magistrate Judge.  The government will not submit additional evidence here.  However, the government does not believe it should let stand statements in the defense brief that are not a fair representation as to the status of the California Superior Court case brought by victim Chase, particularly when it states that the civil lawsuit is "not yet resolved" (Defense brief, p. 5.) and that the allegations are "unproven." (Defense brief, p. 7.)  A proposed decision was rendered in that matter on May 23, 2024 in accordance with the California Rules of Court and the parties have thirty days to file objections.[4]  Should the Court wish to consider the Superior Court's decision, the government will be prepared to present it at the June 10 hearing.

16

17

18

19

20

21

22

The record before the Magistrate Judge sets forth clear and convincing evidence that defendant defrauded the Chases.  The government set forth a narrative of the offense.  (Dkt 75, pp 9-14.)  That narrative was supported with an interview of Mr. Chase (Dkt 75, pp. 105-108) and several exhibits.  (Dkt 75, pp. 110-199.)  In essence, in December 2013, the Chases invested $350,000 for an investment in real property.[5]  Approximately seven months later,

23

24

25

26

[4] Under California law, "[t]he main purpose of an objection to a proposed statement of decision is not to reargue the merits, but to bring to the court's attention inconsistencies between the court's ruling and the document that is supposed to embody and explain that ruling." *Heaps v. Heaps*, 124 Cal.App.4th 286, 292 (2004).

27

28

[5] The defense argues that the government's proffered evidence showing that defendant promptly converted the Chase's money to his own benefit in December 2013 is "incomplete and misleading" because

*(footnote cont'd on next page)*

after defendant and his partner, Belsher, acquired the property, they sold it to a third party, Tank Farm Center, without the Chases' knowledge, to the benefit of a company owned by defendant and Belsher, PB Companies, which obtained an interest in Tank Farm Center.

The $100,000 check that defendant presented for the purpose of posting a bond represents the proceeds of the fraud committed against the Chases.  That money was sourced from a $270,000 payment received by PB Companies for the sale of its interest in Tank Farm Center.[6] (Dkt 75, p. 9-14.)  As such, the funds cannot possibly satisfy any reasonable review as contemplated by *United States v. Nebbia*, 357 F.2d 303, 304 (2nd Cir. 1966) ("If the court lacks confidence in the surety's purpose or ability to secure the appearance of a bailed defendant, it may refuse its approval of a bond even though the financial standing of the bail is beyond question.")  Here, the

---

the property was ultimately purchased a few months later.  (Defense brief, p. 7.)

The government's proffer (Dkt 88, pp. 39-42) was not accepted by the defense (Dkt 88, p. 42) and the court did not consider it for its decision.  (Id.)

Should the defense now accept the proffer, the point of the proffered evidence was to show that defendant personally and directly profited from the fraud.  The fact that the property was purchased with other funds months later does not exonerate the defendant because after the purchase, the property was sold for the benefit of defendant and Belsher without informing Chase.

[6] The sale price also included a $550,000 promissory note which PB Companies offered to the Chases, provided that they enter into a comprehensive settlement agreement that resolved a variety of fraud claims.

The government does not understand the defense argument that the offer of the promissory note refutes the allegation that the Chases were defrauded.  An offer to pay the Chases back their investment plus the return they were promised appears to be more of an acknowledgment of the fraud than a denial.  Moreover, as the government's evidentiary presentation makes clear, the promissory note was a cynical device to entice the Chases to settle the three separate investment fraud schemes.

Chases would likely claim the funds posted by defendant if they were ever released by the Court.  Under such circumstances, the defendant has no incentive to comply with the conditions of release to ensure the return of the money posted as bond.  (Dkt 75, p. 14.)

**VII.   DEFENDANT HAS A HISTORY OF DEFRAUDING FRIENDS & ASSOCIATES**

In response to the Magistrate Judge's opinion that while defendant may have defrauded business partners, he was less likely to defraud friends who might be willing to help him post bond.  In response, the government provided examples in which defendant had defrauded people with whom he had maintained close personal relationships.  This information is relevant not only to further demonstrate that defendant is a danger to the community, but also to show that funds offered by friends should not receive blind acceptance but rather be assessed, in accordance with *Nebbia*, as to whether they will effectively secure defendant's compliance with any order of release.

### A.   Defendant Defrauded LB

Consistent with the Court's Minute Order, the parties have stipulated in the Appendix that the Court should not consider Exhibits M, N, and O, which were filed by the defense in support of the defendant's Application.[7]

---

[7] The government conferred with the defense on multiple occasions prior to filing the Appendix.  On May 28, 2024 at approximately 1:20 p.m., the parties had final discussions, the defense requested some changes to the Appendix, and the government made those changes as directed.  At 1:38 p.m., consistent with those discussions, the government forwarded the final version of the Appendix to defense counsel and requested written authorization to include defense counsel's signature.  As of the 3:00 p.m. filing deadline set by the Court, the government received no response from defense counsel.  Consequently, the government filed the Appendix with a notation above defense counsel's signature line reading, "signature not authorized."

The defense brief argues that LB is not a victim of fraud primarily based upon an argument that the $109,677 in expenses racked up by defendant on LB's credit card were ultimately repaid.  The evidence presented by the government, namely the testimony of LB, shows that defendant paid the debt only after LB's credit cards had been shut down, her entreaties to defendant had failed, and she procured the services of an attorney.  (Dkt 75, pp. 15-17.)[8]  The Magistrate Judge found the government's presentation to be "compelling," adding that "Mr. Wright is not hesitant about doing what he wants to do even if it causes his friends to lose their money."  (Dkt 88, p. 14.)

### B.   **Defendant Defrauded Jonathan Westbay**

The government set forth detailed evidence chronicling frauds defendant perpetrated against Johnathan Westbay, a personal friend of defendant going back to when they were approximately 22 years of age. (Dkt 75, pp. 17-19; Dkt 88, pp. 25-26.)[9]

The defense ignores the allegations of fraud and argues that Jonathan Westbay is a biased and spiteful witness.  (Defense brief,

---

[8] The new evidence proffered by the defendant is based upon a specious argument that defendant provided relatively minor financial benefits to LB prior to the fraud.  There is no doubt that defendant and LB developed a close personal relationship, but any prior largess by the defendant is consistent with attempts to gain the confidence of a victim prior to defrauding them.

Indeed, defendant recently sought to fraudulently capitalize on that prior relationship once again in connection with the instant bond review hearings.  Defendant tendered a character reference letter authored by LB before the fraud without her permission.  LB testified that had she known defendant wished to use the letter, she would have objected because he had come to know defendant's other side, which she described as "[s]hady, untrustworthy, very quick to anger."  (Dkt 75, p. 17.)

[9] The bad checks issued to Westbay in connection with the matter (Dkt 75, pp. 229-239) are the same bad checks referenced in defendant's criminal history.  (Dkt 65, p. 7.)

1   p. 16.)[10]   The government concedes that a victim of fraud might harbor
2   ill-will towards the perpetrator of that crime and that such ill-will
3   could transform into bias and spite.   This concession does not excuse
4   the fraud defendant perpetrated, nor does it refute the government's
5   essential point that the defendant has demonstrated, as the
6   Magistrate Judge found, no hesitation to defraud close personal
7   friends, making the various surety bonds offered by family and
8   friends insufficient to ensure defendant's compliance with conditions
9   of release.

10          C.   **Defendant Defrauded John Pena**

11          Consistent with the Court's Minute Order, the parties have
12   stipulated in the Appendix that the Court should not consider
13   Exhibits P and Q which were filed by the defense in support of the
14   defendant's Application.

15          The defense contends that Pena is not a credible witness.   The
16   government convincingly demonstrated to the Court that whatever
17   credibility issues Pena may have, it does not follow that he would
18   have consented to the defendant racking up over a half million
19   dollars of charges using Pena's credit that were overwhelming used to
20   pay criminal defense attorneys responding to corruption allegations
21   that had nothing to do with Pena (not to mention payments for breast
22   augmentation surgery for one of defendant's girlfriends).   (Dkt 63,
23   pp. 49-51.)

24          In deference to the Court's Minute Order, the government will
25   not respond to evidence submitted by the defense that was not

26   _____

27          [10] The Court might note the incongruousness of defendant's
     proffering positive character witness statements (Dkt 45) while
28   objecting to negative character witness statements such as those
     provided by the victims of his various frauds.

presented to the Magistrate Judge.  However, it does wish to provide
a response to the inaccurate representation that the government
claimed that Pena had "never authorized Wright to open credit cards
in his name or his companies' names." (Defense brief, p. 17.)

In its proffers to the Court, the government made clear that
Pena *had* authorized the defendant to use Pena's credit worthiness and
financial accounts in support of the Texas real estate project.  For
example, the government represented that:

> "Mr. Pena has acknowledged providing Mr. Wright some access
> to some of his financial accounts but according to Mr.
> Pena, they were all business-related in other words, for
> business transactions related to the development of the
> property.  And he saw such things there as clearly personal
> expenses such as -- I remember there was something with
> regard to a breast augmentation surgery that has nothing to
> do clearly with the project."

(Dkt 62, p. 16-17.)

The defense acknowledged the accuracy of the government's
proffer:

> Magistrate Judge: Well, did Mr. Pena -- are you challenging
> that -- are you contending that Mr. Pena authorized a
> breast augmentation or are you saying that he would have
> authorized the use of these cards just for the business?
>
> Defense Counsel: He -- I'm saying that he would have
> authorized the use of the cards for the business.

(Dkt 62, p. 21.)

Similarly, in its written proffers to the Magistrate Judge, the
government explained that Pena *had* authorized defendant to obtain
credit cards in support of the project:

> Pena informed investigators that in early 2023, he and the
> defendant discussed the inability to obtain funding from
> Builders Capital to complete the purchase of the Lang
> Ranch. The defendant told Pena that to demonstrate
> sufficient cash reserves for the lender to fund the loan,
> they should obtain credit cards and other lines of credit
> using Pena's information and credit history. Pena agreed

16

that Wright could obtain such lines of credit only for the defendant's stated purpose of getting the loan approved.

(Dkt 42, p. 6.)

## VIII.      DEFENDANT STIPULATED TO THE TERMS OF THE PROTECTIVE ORDER & THE GOVERNMENT HAS ACCOMODATED HIS REQUESTS FOR MODIFICATION

The defense complains that defendant's continued detention has hamstrung their case preparation because of defendant's inability to access "protected" files while he is in custody. (Defense brief, p. 7.)

The defendant's incarceration status pending trial is not unique.  Nor is the instant case so complex as to justify defendant's pretrial release.  Indeed, much of the offense conduct constitutes a rank fraud in which defendant converted investor money to support a decadent and lavish lifestyle.

The "protected" status of the files in question stem from a *Stipulation and Joint Request* for a Protective Order filed by the parties.  (Dkt 37.)  As it has done in the past, the government is amenable to working with the defense to ensure the defendant has reasonable access to discovery while incarcerated.