E. MARTIN ESTRADA
United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
THOMAS F. RYBARCZYK (Cal Bar No. 316124)
BILLY JOE MCLAIN (Cal Bar No. 290682)
Assistant United States Attorneys
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Senior Litigation Counsel
Public Corruption & Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-8452/6702/2468
     E-mail:    thomas.rybarczyk@usdoj.gov
                billy.mclain@usdoj.gov
                daniel.obrien@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 23-492(A)-PA |
|---|---|
| Plaintiff, | GOVERNMENT'S SUPPLEMENTAL SENTENCING POSITION REGARDING RESTITUTION |
| v. | |
| RYAN WRIGHT,<br>    aka "Ryan Petetit," | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Thomas F. Rybarczyk, Billy Joe McLain, and Daniel J. O'Brien, hereby files its Supplemental Sentencing Position for Defendant Ryan Wright Regarding Restitution.

///

///

///

This position is based upon the attached memorandum of points and authorities, the Declaration of Thomas F. Rybarczyk and the exhibits referenced therein, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 20, 2025                Respectfully submitted,

                                         E. MARTIN ESTRADA
                                         United States Attorney

                                         LINDSEY GREER DOTSON
                                         Assistant United States Attorney
                                         Chief, Criminal Division

                                                /s/
                                         THOMAS F. RYBARCZYK
                                         DANIEL J. O'BRIEN
                                         BILLY JOE MCLAIN
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant RYAN WRIGHT ("defendant") defrauded investors in a Texas real estate project and racked up hundreds of thousands of dollars in unauthorized charges on his business partner's credit cards to both escape criminal charges for bribes he paid and continue living his lavish lifestyle.  For these crimes, defendant was charged in the First Superseding Indictment with wire fraud, attempted bank fraud, and access device fraud in Counts 4-21.  To resolve his case, defendant entered into a plea agreement in which he agreed to plead guilty to the bribery conspiracy.  (Dkt. 149.)  As part of that same agreement, while the government agreed to dismiss the remaining counts of the First Superseding Indictment, defendant agreed that this Court may order restitution to the victims of Counts 4-21, i.e., the victims of his wire fraud, attempted bank fraud, and access device fraud, and that "he owes approximately $1,500,000 in restitution."  (Dkt. 149, ¶¶ 3.C., 7.)  The government's position, however, is that defendant owes more in restitution to those he defrauded, namely, $1,811,216.46.  This case's facts and controlling authority support the amount the government seeks in restitution.

**II.   FACTUAL BACKGROUND**

   **A.   Investor Fraud (Counts 4-17)**

In 2022, defendant and his two business partners, John Pena and Diamandia Lingos, sought to develop a residential real estate project in Dripping Springs, Texas.  (Dkt. 159, Revised Presentence Report ("RPSR"), ¶ 90; Ex. 1 at USAO_00053359.)  As part of that effort, defendant created materials to solicit money from investors, including individuals connected to Pena.  (RPSR ¶¶ 90-91; Ex. 1 at

USAO_00053359.)  Those materials included a subscription agreement that was to be executed by the investor and defendant and represented that the investors would acquire ownership in Mission Oaks Group Robles Ranch Dripping Springs, LLC ("MOGRRDS"), the investment vehicle being used to develop the real estate project.  (RPSR ¶ 91; Ex. 1 at USAO_00053359.)  This subscription agreement specifically referred to a private placement memorandum, which explained how the investor money would be spent:[1]

| Category | Estimated Use of Proceeds |
| --- | --- |
| Survey Final Map | $55,000 |
| HOA and CCRC's | $15,000 |
| Due Diligence Acquisition Fee | $178,000 |
| Legal / Legal Final Map | $75,000 |
| Performance / Map Guarantee Bond 1.2% | $56,400 |
| Arborist | $5,000 |
| Marketing - Graphics - Digital - Print | $60,000 |
| Overhead | $318,000 |
| Office and Admin | $82,500 |
| LS and Amenity Architect | $45,000 |
| Soils | $6,500 |
| Custom Spec House Plans (1-2) | $295,000 |
| Standard + House Plans (2) | $210,000 |
| Civil Construction Drawings | $135,000 |

---

[1] Despite being referenced in the subscription agreement, it is not clear if all investors received the private placement memorandum. (Ex. 1 at USAO_00053359.)

2

| Category | Estimated Use of Proceeds |
|---|---|
| Brandon Mann PM and Expedite | $59,280 |
| Jon Thompson Expedite | $45,000 |
| Contingency | $82,034 |
| **Total** | $1,640,680 |

(Ex. 1 at USAO_00053360-USAO_00053361.)  This same memorandum represented to investors that any excess proceeds raised from the offering would be applied to "to costs related to the acquisition and horizontal development of the Property."[2]  (RPSR ¶ 92; Ex. 1 at USAO_00053361.)  None of these materials indicated that defendant would take investor money and convert it for his own personal use.  Instead, defendant represented in these materials and in conversations that the money would be used to develop and build the project, which the investors believed would turn a profit of approximately $11,000,000. (RPSR ¶ 93; Ex. 1 at USAO_00053359-USAO_00053360.)  It did not.

In total, with Pena's help, defendant raised a total of $1,282,357.85 from investors who transferred their money to the MOGRRDS Chase Bank account ending in 1358 (the "MOGRRDS Chase Account").  Those transfers are reflected in the chart below:

| Date | Deposits | Investor Funds | Bates |
|---|---|---|---|
| May 2, 2022 | A.V.[3] | $69,687.85 | USAO_00053719 |
| May 4, 2022 | M.S. LLC | $400,000.00 | USAO_00053719 |
| May 9, 2022 | V.M.H. | $100,000.00 | USAO_00053719 |

---

[2] Horizontal costs "refer to excavation, infrastructure, and Landscaping" costs.  (Ex. 1 at USAO_00053361.)

[3] The government will provide the United States Probation and Pretrial Services Officer the full names of the individuals and companies owed restitution.

3

| Date | Deposits | Investor Funds | Bates |
|---|---|---|---|
| May 11, 2022 | B.C. LLC | $200,000.00 | USAO_00053724; USAO_00053720 |
| May 25, 2022 | B.K. | $250,000.00 | USAO_00053726; USAO_00053720 |
| May 31, 2022 | A.G. | $100,000.00 | USAO_00053720 |
| June 15, 2022 | C. LLC | $100,000.00 | USAO_00053727 |
| September 8, 2022 | M.I. LLC | $50,000.00 | USAO_00053741 |
| September 8, 2022 | C.Z.[4] | $12,670.00 | USAO_00053741 |
| | **Total** | **$1,282,357.85** | |

(Ex. 2.)

Within days of getting that first infusion of investor cash, defendant started diverting it from the MOGRRDS Chase Account to his Wright Equity Limited Pomona Fund Chase Account ending in 0357 (the "Wright Equity Chase Account"). Specifically, defendant made the following transfers:

| Date | Type of Transaction | Amount | Bates |
|---|---|---|---|
| May 6, 2022 | Transfer | $50,000.00 | USAO_00053720 |
| May 9, 2022 | Transfer | $125,000.00 | USAO_00053720 |
| May 18, 2022 | Transfer | $15,000.00 | USAO_00053720 |
| May 23, 2022 | Transfer | $50,000.00 | USAO_00053720 |
| June 1, 2022 | Transfer | $25,000.00 | USAO_00053728 |
| June 6, 2022 | Transfer | $30,000.00 | USAO_00053728 |
| June 7, 2022 | Transfer | $30,000.00 | USAO_00053728 |
| June 16, 2022 | Check | $10,000.00 | USAO_00053731; USAO_00053728 |

---

[4] C.Z. said when she learned escrow was closing without a purchase of the land for the Dripping Springs project, she told the title company to transfer her investment to the MOGRRDS Chase Account, which is why this amount is associated with the Secured Land Transfers LLC. (Ex. 3.) She also said that she loaned defendant $20,000 in November 2021. When defendant failed to repay the loan, defendant told C.Z. in April 2022 that he was reimbursing her with equity in the Dripping Springs project. (Id.) The government is seeking additional evidence of this $20,000 equity share from C.Z. If it obtains it, it will provide further evidence to the Court and defendant and amend its restitution request.

4

| Date | Type of Transaction | Amount | Bates |
|---|---|---|---|
| June 24, 2022 | Transfer | $23,000.00 | USAO_00053728 |
| June 29, 2022 | Check | $31,404.10 | USAO_00053732; USAO_00053728 |
| July 5, 2022 | Transfer | $30,000.00 | USAO_00053733 |
| July 12, 2022 | Transfer | $125,000.00 | USAO_00053734 |
| July 18, 2022 | Check | $18,500.00 | USAO_00053737; USAO_00053733 |
| July 19, 2022 | Transfer | $25,000.00 | USAO_00053734 |
| July 29, 2022 | Transfer | $25,000.00 | USAO_00053734 |
| August 15, 2022 | Transfer | $16,000.00 | USAO_00053738 |
| September 8, 2022 | Transfer | $61,000.00 | USAO_00053741 |
| | Total: | $689,904.10 | |

(Ex. 4.)  In addition to these transfers, defendant also paid his criminal defense attorneys $53,300.00 directly from the MOGRRDS Chase Account.[5] (Id. at USAO_00053717, USAO_00053720.)  He also transferred investor money to other accounts he controlled via other money transfer methods and paid his own credit card.

Defendant used that money transferred to his Wright Equity Chase Account to pay himself and his personal expenses, including his own credit cards, his BMW car payments, and over $100,000 in legal bills from his criminal defense attorneys.  (Ex. 4; see also RPSR ¶¶ 94-95; Ex. 1 at USAO_00053362- USAO_00053363.)  He also used this same account to help him defraud two more individuals who also agreed to invest in the Dripping Springs project, M.B. and A.K.[6]  Specifically,

---

[5] Defendant did pay certain expenses using the MOGRRDS Chase Account that appear project-related, which appears to be defendant's principal disagreement with the government's proposed restitution figure.  Specifically, he paid approximately $317,000 in what appear to be project-related costs.  (Ex. 4 at USAO_00053728, USAO_00053728, USAO_00053720, USAO_00053717.)  As discussed more fully below, the law is clear that defendant does not get to offset those expenditures against his restitution obligation.

[6] A.K. provided his investment via his company, C.C. CPR.

M.B. invested $250,000 on October 3, 2023, and A.K. invested $20,000 on November 28, 2022. (Ex. 4 at USAO_00071638, USAO_00071643.) Defendant convinced both men to invest in the real estate project, even though defendant and his company were not even under contract to buy the land for the Dripping Springs project at the time – a fact defendant never disclosed to investors. (RPSR ¶ 102.) Indeed, by the time A.K. invested, the landowner had sued the company defendant had planned to use to buy the land for breach of contract. (Compare Ex. 1 at USAO_00053359 (suit filed on October 26, 2022) with Ex. 4 at USAO_00071643 (A.K. providing $20,000 wire on November 28, 2022).)

**B. Access Device Fraud (Count 21)**

While Pena and defendant struggled to secure funding for the Dripping Springs project, defendant told Pena they needed to show they had more liquidity, which, according to defendant, they could do by opening more lines of credit. (Ex. 5, USAO_00075168.) Pena agreed to allow defendant to do that and to use those lines of credit for project expenses only. (Ex. 6.) Defendant opened 24 credit cards, most in the name of Pena's various companies. (Dkt. 42, p.6.) Of those credit cards, nine were in Pena's name.[7] (Id.)

Defendant did not limit his spending to project-related expenses. Instead, much like he used the investor money, defendant used the credit cards opened with Pena's credit to pay for Las Vegas hotel rooms, sporting events, restaurants, bars, health spas, and even breast augmentation for a female friend. (Dkt. 42, pp. 6-7.) And, like he did with the investor funds, he used Pena's credit cards

---

[7] After executing a search warrant on defendant's residence at the time of his arrest, the government found 16 of these cards. (Dkt. 42, p. 5.)

6

to pay his and his company's criminal defense attorneys over $150,000.  (Id., p. 7.)

In total, defendant charged the following amounts on these credit cards:

| Name | Company | Institution | Card Number | Charges |
|---|---|---|---|---|
| John J Pena | Wright Equity LLC | AMEX | 71001 | $8,551.15 |
| Ryan Wright | Wright Equity LLC | AMEX | 71019 | $179,204.65 |
| John J Pena | Wright Equity Limited Pomona Fund | Chase | 75865 | $9,467.89 |
| John J Pena | Mission Oak Group | Chase | 74417 | $84,901.93 |
| Accounts Payable | John Pena LLC | U.S. Bank | 9959 | $9,000.00 |
| Accounts Payable | Basement Ventures Inc. | U.S. Bank | 8061 | $4,750.00 |
| Ryan Wright | 101 Restaurant Group | U.S. Bank | 4166 | $7,375.71 |
| Ryan Wright | JP 1518, Inc. | U.S. Bank | 3142 | $20,000.00 |
| Ryan Wright | Mission Oak Group LLC | U.S. Bank | 8079 | $100,864.91 |
| Accounts Payable | Wright Equity Limited | U.S. Bank | 0675 | $43,000.00 |
| Ryan Wright | Wright Equity Limited | U.S. Bank | 6157 | $2,035.86 |
| | | | **Total:** | $469,152.10 |

(Exs. 7-17.)  In its review of the charges in the above spreadsheet, the government identified payments that defendant made and project-related expenses for which Pena told defendant he could use the credit cards.  These offsets totaled $134,974.26.  Additionally, defendant has identified $75,319.23 in offsets, including a $50,000 payment Pena said defendant made toward paying the credit card debt Pena had incurred.  The government agreed offset the $469,152.10 owed to Pena by these amounts ($134,974.26 and $75,319.23).  This means

7

that the government's total restitution demand for Pena is $258,858.61.

## III. ARGUMENT

### A. Applicable Law

Federal courts may "order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." 18 U.S.C. § 3663(a). The government must establish the restitution amount by a preponderance of the evidence. See United States v. Waknine, 543 F.3d 546, 556 (9th Cir. 2008) (citing 18 U.S.C. § 3664). The Mandatory Victims Restitution Act ("MVRA") serves a remedial purpose, which is why it gives "district courts a degree of flexibility in accounting for a victim's complete losses." Id. 557. In exercising this flexibility, the district court may rely on any evidence that possesses "sufficient indicia of reliability to support its probable accuracy." Id. (internal quotation marks omitted.)

### B. Defendant Owes $1,811,216.46 in Restitution to His Victims

As an initial matter, because defendant agreed in the plea agreement to pay restitution to the victims of Counts 4-21, this Court may order restitution to the victims of those crimes, even though these were not the counts of conviction. (Dkt. 149, ¶ 7.) Here, defendant has also agreed that "he owes approximately $1,500,000 in restitution." (Id.) While defendant did not specify in the plea agreement his dispute with the government's restitution calculation, his principal disagreement with the government's calculation appears to be its inclusion of the project-related costs from the MOGRRDS Chase Account. As discussed above, the government

has identified approximately $317,000 in what appear to be project-related expenses from the MOGRRDS Chase Account.  According to defendant, because these funds were in fact expended on furthering the project, this amount should be offset from his restitution order.

But that is not the law. The MVRA and its remedial purpose requires defendants to return property lost by victims of their crimes. 18 U.S.C. § 3663A(b)(1)(A); see also United States v. Gossi, 608 F.3d 574, 579-80 (9th Cir. 2010) ("The purpose of restitution is to put the victim back in the position he or she would have been but for the defendant's criminal conduct.").

In this case, the property is money. Robers v. United States, 572 U.S. 639, 640-41 (2014) (interpreting "property" under the MVRA to include money).  Where the return of property "is impossible, impracticable, or inadequate," the defendant shall pay an amount equal to "the value of the property on the date of the . . . loss."  § 3663A(b)(1)(B)(i).  In the investor fraud context, courts have interpreted this to mean repaying all the money lost by the victims.  See United States v. Holmes, 673 F. Supp. 3d 1049, 1058 (N.D. Cal. 2023).

For example, in Holmes, the district court rejected defendants' argument that the victim investors' restitution award should be reduced by the fair value of the shares absent the defendants' fraudulent conduct.  Id. at 1057-58.  There, the district court found that "[a]n investor victim's loss is the full amount of the property given (i.e., money) at the time of the fraudulently induced investments, irrespective of any shares the victims received or the value of those shares."  Id. at 1058.

9

Similarly, in United States v. Sarad, the district court there rejected a securities fraud defendant's argument that some victim investor's money had been used for legitimate corporate purposes. 227 F. Supp. 3d 1153, 1159 (E.D. Cal. 2016). The court reasoned that "what eventually happened to the investor's money is irrelevant under the MVRA because the statute provides for calculating restitution based on what the victims lost at the time of [defendant's] fraudulent conduct, not afterwards." Id. Further, the legitimate corporate work paid for with investor money "did not physically return property or funds to the victims and is therefore not relevant."[8] Id.

The same is true. The fact that defendant used a small percentage of the investor funds to pay project costs is irrelevant. He defrauded these investors by making them believe he intended to use the money to pay for the project, not to convert the money for his personal expenses and criminal defense attorneys. His argument should be rejected.

To the extent he disputes that the government has failed to adequately prove he owes restitution to these victims, that argument should fail, too. In the investor scheme, the evidence proffered by the government demonstrates that he and others working with him represented to investors that their money would be spent on

---

[8] There is a MVRA provision that allows for a defendant to reduce his restitution figure by the value of the property, e.g., money, that is returned to the victim. § 3663A(b)(1)(B)(ii) (calculating restitution as the "the value (as of the date the property is returned) of any part of the property that is returned"). There is no evidence that defendant refunded the investors here any money such that he should get credit for this offset. Nor does he have any property interest that he could convey to those investors to offset his restitution figure.

developing the Dripping Springs project.  It was not.  Instead, as detailed above, defendant converted the investor money for his personal expenditures, including criminal defense attorneys.  He started his theft of investor funds mere days after receiving the first investor deposit.  As for the access device fraud, given the sheer amount of personal purchases made over several credit cards demonstrate that he did not have permission to use Pena's credit cards for his personal expenses.  There can be little dispute that Pena did not authorize defendant to use credit cards in his name for the hundreds of thousands of personal expenses, including for criminal defense attorneys and breast augmentation.

**IV.   CONCLUSIONS**

For the foregoing reasons, the government requests that this Court enter an order requiring defendant to pay $1,811,216.46 in restitution to the victims of his crimes.