AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of: 450 North 3rd Street, Grover Beach, CA 93433 | ) ) ) ) ) | Case No. 2:23-MJ-5551 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371, 18 U.S.C. § 666, 18 U.S.C. § 1343, 18 U.S.C. § 1344, 18 U.S.C. §§ 1343, 1346, 18 U.S.C. § 1503, and 18 U.S.C. § 1519 | Conspiracy, Federal Program Bribery, Wire Fraud, Bank Fraud, Honest Services Wire Fraud, Obstruction of Justice, and Falsification of Records |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Dieter Willkomm
*Applicant's signature*

_____
Dieter Willkomm- FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _Oct0ber 27, 2023_

_____
*Judge's signature*

City and state: _Los Angeles, CA_

Honorable Karen L. Stevenson, U.S. Magistrate Judge
*Printed name and title*

AUSA: Dan O'Brien- 213- 894-2468
     Thomas Rybarczyk- 213- 894-8452

USAO_00053330

SUBJECT TO PROTECTIVE ORDER

## ATTACHMENT A-2

### SUBJECT PREMISES

The premises to be searched is located at 450 North 3rd Street, Grover Beach, CA 93433 (the "SUBJECT PREMISES"). The SUBJECT PREMISES, pictured below, is further described as a two story tan residence with a red tile roof. The numbers "450" on the front near the white front door.



USAO_00053331

SUBJECT TO PROTECTIVE ORDER

## ATTACHMENT B

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 666 (Federal Program Bribery), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud), 18 U.S.C. §§ 1343, 1346 (Honest Services Wire Fraud), 18 U.S.C. § 1503 (Obstruction of Justice), and 18 U.S.C. § 1519 (Falsification of Records) (collectively, the "Subject Offense/s"), for the time period of July 1, 2014 to the present, namely:

      a.    any records, documents, communications, notes, or other materials regarding or reflecting efforts to secure governmental approvals for PB Companies, LLC;

      b.    any records, documents, communications, notes, or other materials regarding or reflecting payments to, or intended for, public officials;

      c.    any records, documents, communications, notes, or other materials regarding San Luis Obispo County Supervisor Adam Hill;

      d.    any records, documents, communications, notes, or other materials regarding San Luis Consulting, LLC;

      e.    any records, documents, communications, notes, or other materials showing payment, receipt, concealment, transfer, solicitation, or movement of money reflecting bribe payments, including but not limited to bank account records, wire transfer

i

USAO_00053332

SUBJECT TO PROTECTIVE ORDER

records, bank statements, financial records, and notes, including documents written in vague or coded language;

f.    any records, documents, communications, notes, or other materials reflecting efforts to obstruct a criminal investigation, falsify records, or tamper with a witness, victim, or information;

g.    any records, documents, communications, notes, or other materials relating PB_131 or the Orcutt Marketplace Draw #2 or any other payments related to the Orcutt Marketplace project;

h.    any records, documents, communications, notes, or other materials related to the solicitation of investors and/or receipt of investor funds involving Ryan Wright, John Pena, Diamandia Lingos, David Bader, Wright Equity Limited Pomona Fund, Mission Oak Group, LLC, Mission Oaks Group Robles Ranch Dripping Springs, LLC, DL Consulting, LLC, or Davy Crockett Estates, LLC;

i.    any records, documents, communications, notes, or other materials related to real estate acquisition and/or development projects involving Ryan Wright, John Pena, Diamandia Lingos, Carl Lang, Wright Equity Limited Pomona Fund, Mission Oak Group, LLC, Mission Oaks Group Robles Ranch Dripping Springs, LLC, DL Consulting, LLC, Davy Crockett Estates, LLC, and/or Lang Family Ranches, L.P.;

j.    any records, documents, communications, notes, or other materials related to loan applications with South Star Bank, Texas Regional Bank, Silver Arch Capital Partners,

USAO_00053333

SUBJECT TO PROTECTIVE ORDER

Builders Capital, Axen Mortgage, LLP, and/or Security State Bank & Trust;

k.    any records, documents, communications, notes, or other materials related to loan applications with any lending institution related to the acquisition, prospective acquisition, or development of property owned by Lang Family Ranches, L.P.;

l.    any records, documents, communications, notes, or other materials related to financial transactions engaged in by Ryan Wright, John Pena, Diamandia Lingos, Jason Blankenship, David Bader (or companies under his control), Wright Equity Limited Pomona Fund, Mission Oak Group, LLC, Mission Oaks Group Robles Ranch Dripping Springs, LLC, DL Consulting, LLC, or Davy Crockett Estates, LLC;

m.    Records or evidence of absence of the same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, SMS text, Whatsapp, email communications or other text or written communications) sent to or received from any digital device to facilitate the above listed violations;

n.    Records of address book information, including all stored or saved telephone numbers; and

o.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3.    With respect to a digital device containing evidence falling within the scope of the foregoing categories of items to be seized, the following evidence may also be seized:

iii

USAO_00053334

SUBJECT TO PROTECTIVE ORDER

a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.   evidence of the attachment of other devices;

c.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

d.   evidence of the times the device was used;

e.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

f.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

g.   records of or information about Internet Protocol addresses used by the device; and

h.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

iv

USAO_00053335

SUBJECT TO PROTECTIVE ORDER

4.   As used herein, the terms "records," "information,"
"documents," "programs," "applications," and "materials" include
records, information, documents, programs, applications, and
materials created, modified, or stored in any form, including in
digital form on any digital device and any forensic copies
thereof.

5.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile phones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.  SEARCH PROCEDURE FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

6.   The following procedures will be followed at the time
of the search in order to avoid unnecessary disclosures of any
privileged attorney-client communications or work product.

<u>Non-Digital Evidence</u>

v

USAO_00053336

SUBJECT TO PROTECTIVE ORDER

7.    Prior to reading any document or other piece of evidence ("document") in its entirety, law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search (the "Search Team") will conduct a limited review of the document in order to determine whether or not the document appears to contain or refer to communications between John Belsher, Eddie Jauregui, Rachel Chuang, Anne Cyr, Roy Ogden, John Fricks, Jennifer Williams, Gabrielle Tujillo, Gary Slavett, Patrick Fisher, Gary Kaufman, Noam Reiffman, Jeff Isaacs, and Robert Gookin and any person ("potentially privileged information").  If a Search Team member determines that a document appears to contain potentially privileged information, the Search Team member will not continue to review the document and will immediately notify a member of the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case).  The Search Team will not further review any document that appears to contain potentially privileged information until after the Privilege Review Team has completed its review.

8.    In consultation with a Privilege Review Team Attorney ("PRT Attorney"), if appropriate, the Privilege Review Team member will then review any document identified as appearing to contain potentially privileged information to confirm that it contains potentially privileged information.  If it does not, it may be returned to the Search Team member.  If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review

USAO_00053337

SUBJECT TO PROTECTIVE ORDER

only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant. Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further review or seizure absent subsequent authorization. Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information. The Privilege Review Team member will also make sure that the locations where the documents containing potentially privileged information were seized have been documented.

9.    The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRT Attorney. If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Search Team. If appropriate based on review of particular documents, the PRT Attorney may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

<u>Digital Evidence</u>

10.  The Search Team will search for digital devices capable of being used to facilitate the subject offenses or capable of containing data falling within the scope of the items

USAO_00053338

SUBJECT TO PROTECTIVE ORDER

to be seized.  The Privilege Review Team will then review the identified digital devices as set forth herein.  The Search Team will review only digital device data which has been released by the Privilege Review Team.

11.  The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

12.  The Privilege Review Team and the Search Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

13.  The Search Team will provide the Privilege Review Team with a list of "privilege key words" to search for on the digital devices, to include specific words like John Belsher, Eddie Jauregui, Rachel Chuang, Anne Cyr, Roy Ogden, John Fricks, Jennifer Williams, Gabrielle Tujillo, Gary Slavett, Patrick Fisher, Gary Kaufman, Noam Reiffman, Jeff Isaacs, and Robert Gookin, and Holland & Knight or their email addresses, and generic words such as "privileged" or "work product."  The Privilege Review Team will conduct an initial review of the data on the digital devices using the privilege key words, and by using search protocols specifically chosen to identify documents or data containing potentially privileged information.  The Privilege Review Team may subject to this initial review all of

USAO_00053339

SUBJECT TO PROTECTIVE ORDER

the data contained in each digital device capable of containing
any of the items to be seized.  Documents or data that are
identified by this initial review as not potentially privileged
may be given to the Search Team.

14.  Documents or data that the initial review identifies
as potentially privileged will be reviewed by a Privilege Review
Team member to confirm that they contain potentially privileged
information.  Documents or data that are determined by this
review not to be potentially privileged may be given to the
Search Team.  Documents or data that are determined by this
review to be potentially privileged will be given to the United
States Attorney's Office for further review by a PRT Attorney.
Documents or data identified by the PRT Attorney after review as
not potentially privileged may be given to the Search Team.  If,
after review, the PRT Attorney determines it to be appropriate,
the PRT Attorney may apply to the court for a finding with
respect to particular documents or data that no privilege, or an
exception to the privilege, applies.  Documents or data that are
the subject of such a finding may be given to the Search Team.
Documents or data identified by the PRT Attorney after review as
privileged will be maintained under seal by the investigating
agency without further review absent subsequent authorization.

15.  The Search Team will search only the documents and
data that the Privilege Review Team provides to the Search Team
at any step listed above in order to locate documents and data
that are within the scope of the search warrant.  The Search
Team does not have to wait until the entire privilege review is

USAO_00053340

SUBJECT TO PROTECTIVE ORDER

concluded to begin its review for documents and data within the
scope of the search warrant.  The Privilege Review Team may also
conduct the search for documents and data within the scope of
the search warrant if that is more efficient.

16.  In performing the reviews, both the Privilege Review
Team and the Search Team may:

a.  search for and attempt to recover deleted,
"hidden," or encrypted data;

b.  use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

c.  use forensic examination and searching tools,
such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit),
which tools may use hashing and other sophisticated techniques.

17.  Neither the Privilege Review Team nor the
Investigation Team will seize contraband or evidence relating to
other crimes outside the scope of the items to be seized without
first obtaining a further warrant to search for and seize such
contraband or evidence.

18.  In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.  If the search determines that a digital device
does not contain any data falling within the scope of items to
be seized, the government will, as soon as is practicable,

x

USAO_00053341

SUBJECT TO PROTECTIVE ORDER

return the device and delete or destroy all forensic copies thereof.

b.    If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

c.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

d.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

e.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

19.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to

USAO_00053342

SUBJECT TO PROTECTIVE ORDER

law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

20.  During the execution of this search warrant, law enforcement is permitted to: (1) depress RYAN WRIGHT's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of RYAN WRIGHT's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

21.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

USAO_00053343

SUBJECT TO PROTECTIVE ORDER

**AFFIDAVIT**

I, DIETER WILLKOMM, being duly sworn, declare and state as
follows:

## I.  PURPOSE OF AFFIDAVIT

1.    The purpose of this affidavit is to locate, seize, and
search digital devices, primarily any mobile, smart phone,
computer, or hard drive, in the possession, custody, or control
of RYAN WRIGHT ("WRIGHT" or "SUBJECT PERSON"), as well as other
evidence of WRIGHT's alleged crimes and Subject Offenses.
WRIGHT was indicted on October 4, 2023 in a corruption and
obstruction of justice case, which is currently under seal
pending WRIGHT's arrest.  Additionally, newly discovered
evidence indicates WRIGHT is currently involved in an ongoing
wire and bank fraud scheme.

2.    Accordingly, this affidavit is made in support of an
application for warrants to search the following:

a.    SUBJECT PERSON: WRIGHT, as further described in
Attachment A-1;

b.    SUBJECT PREMISES: The premises located at 450
North 3rd Street, Grover Beach, CA 93433, as further described
in Attachment A-2; and

c.    SUBJECT VEHICLE: A 2021 Silver BMW Sedan, as
further described in Attachment A-3.

3.    This affidavit seeks authorization to seize evidence,
fruits, and instrumentalities of violations of 18 U.S.C. § 371
(Conspiracy), 18 U.S.C. § 666 (Federal Program Bribery), 18
U.S.C. §  1343 (Wire Fraud), 18 U.S.C. §  1344 (Bank Fraud), 18

USAO_00053344

SUBJECT TO PROTECTIVE ORDER

U.S.C. §§ 1343, 1346 (Honest Services Wire Fraud), 18 U.S.C.
§ 1503 (Obstruction of Justice), and 18 U.S.C. § 1519
(Falsification of Records) (collectively, the "Subject
Offenses") (collectively, the "Subject Offenses"), as further
described in Attachment B.

     4.    Attachments A-1, A-2, A-3, and B are incorporated
herein by reference.

     5.    The facts set forth in this affidavit are based upon
my training and experience, my personal observations,
information obtained from various law enforcement personnel and
witnesses, and an indictment returned by a federal grand jury on
October 4, 2023 against WRIGHT.  This affidavit is intended to
show merely that there is sufficient probable cause for the
requested search warrant.  It does not purport to set forth all
my knowledge of, or investigation into, this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.[1]

                II.  **BACKGROUND OF SPECIAL AGENT DIETER WILLKOMM**

     6.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and have been so employed since May 1997.
I am currently assigned to work public corruption in the Santa
Maria Resident Agency of the Los Angeles Field Office.  During

-----

     [1] On October 26, 2023, the Honorable Maria A. Audero, United
States Magistrate Judge, signed two warrants for email accounts
related to this investigation relying upon most of the facts
contained in this affidavit in case numbers 2:23-MJ-5456 and
2:23-MJ-5458.

USAO_00053345

SUBJECT TO PROTECTIVE ORDER

my employment with the FBI, I have participated in multiple
investigations, including those involving bribery, corruption,
wire fraud, and tax evasion.  Many of these investigations have
involved the use of informants, cooperating witnesses, financial
analysis, and other investigative techniques.  I am familiar
with the facts and circumstances of this investigation, as set
forth in this affidavit, as a result of the following: (1) my
training and experience; (2) my personal involvement in this
investigation; (3) direct and indirect discussions with other
Federal, state, and local law enforcement familiar with this
investigation, and their training and experience; and (4) my
review of reports and other documents prepared by local law
enforcement officers.

### III.  STATEMENT OF PROBABLE CAUSE

**A.  WRIGHT's Bribery Scheme and Obstructive Conduct**

    1.  The Bribery Scheme

7.  In or around June 2014, WRIGHT and ADAM HILL, then a
San Luis Obispo County Supervisor, conspired along with WRIGHT's
business partner, JOHN BELSHER, to bribe HILL to, among other
things, vote for real estate development projects associated
with PB COMPANIES, LLC, a company owned by WRIGHT and BELSHER,
and to advise other officials in San Luis Obispo County,
particularly officials in the City of San Luis Obispo, to
support PB COMPANIES's projects.  HILL represented the Third
District, which encompassed a majority of the geography and
population of the City of San Luis Obispo.

3

USAO_00053346

SUBJECT TO PROTECTIVE ORDER

8.    From the outset of their scheme, WRIGHT, BELSHER, and
HILL sought to conceal HILL's relationship to the company and
recognized the importance of doing so to their scheme.  For
example, during a text message discussion between WRIGHT and
HILL in June 2014 discussing the creation of a separate entity
to pay HILL for his work advocating for PB COMPANIES's projects,
WRIGHT told HILL that BELSHER "wants to protect all three of us"
"[a]nd put[ting] a gag order on all three of us [is a] good
idea[]."  WRIGHT warned HILL that "[l]oose lips sink ships."  To
that end, on July 9, 2014, WRIGHT and BELSHER caused the
creation of San Luis Consulting, LLC for HILL to be paid by PB
COMPANIES.  HILL told WRIGHT in a text message exchange in July
2014 that he liked the idea of San Luis Consulting paying him
because WRIGHT, BELSHER, and HILL could keep their arrangement
"private" by only disclosing San Luis Consulting's income on
HILL's Statement of Economic Interest, commonly known as a Form
700, and not the true source of the income, PB COMPANIES.[2]

9.    At the beginning of their scheme, WRIGHT and HILL
recognized the risk and problem with HILL using his power to
advocate for projects in San Luis Obispo county.  Specifically,
in suggesting that HILL could initially do work on the Orcutt
project, a PB COMPANIES project in Santa Barbara County, WRIGHT

---

[2] California Political Reform Act, California Government
Code Section 81000, et seq., required HILL to file a Statement
of Economic Interest, also known as a Form 700.  Form 700s
required elected officials to disclose on an annual basis
income, investments, and gifts received by the elected official,
among other financial interests.  Form 700s were required to be
filed annually by April of the following calendar year.

4

USAO_00053347

SUBJECT TO PROTECTIVE ORDER

sent a text message to HILL in which he wrote "it would be a safe place for [HILL] to start since it's not even in" San Luis Obispo County.

10.  Despite their recognition of this risk, HILL set to work advocating for PB COMPANIES in San Luis Obispo County, particularly, in the City of San Luis Obispo, after reaching an agreement with WRIGHT and BELSHER.  Over the next two and half plus years, WRIGHT and BELSHER sought to use HILL's power in San Luis Obispo County to influence key decisions on PB COMPANIES's projects, including in connection with PB COMPANIES's project San Luis Square.  HILL also took two votes in support of PB COMPANIES projects, the first coming in December 2014 (Toad Creek Homes, LLC) and the last in October 2016 (Las Tablas Villas).

11.  During this same period of time, PB COMPANIES issued approximately $91,000 in checks and/or wire transfers to HILL and/or San Luis Consulting.  WRIGHT also arranged for HILL to receive $2,500 from a developer seeking approvals in the City of San Luis Obispo.  WRIGHT also flew himself and HILL to San Francisco on a semi-private jet to attend a San Francisco Giants playoff game.  WRIGHT used PB COMPANIES's funds to pay for HILL's $1,032 ticket and hotel accommodations.  HILL's final payment came in the form of a wire transfer from PB COMPANIES on November 23, 2016, a little over a month after HILL took a vote in favor a PB COMPANIES project.

12.  While HILL disclosed his income from San Luis Consulting (not PB COMPANIES) on his 2014 Form 700, HILL did not

USAO_00053348

SUBJECT TO PROTECTIVE ORDER

disclose the income he received from San Luis Consulting and PB
COMPANIES in 2015 and 2016, even though HILL's company received
$54,900 from PB COMPANIES in 2015 and $10,000 in 2016.  HILL
filed his 2016 Form 700 on March 29, 2017.  These two filings
came after HILL publicly denied in a Facebook post on his
campaign page that he was a "'paid lobbyist' or consultant or
whatever" in an anticipation of an article being published
concerning his ties to PB Companies in October 2015 and WRIGHT's
domestic violence arrest in November 2015.

　　　　　2.　Obstruction Conduct

　　　13.　In connection with the FBI's public corruption
investigation, the FBI searched HILL's home and County office on
March 11, 2020.  Later that month, an article ran in the San
Luis Obispo Tribune later publicizing the fact of those
searches.  The following month, the FBI interviewed BELSHER and
WRIGHT.  In June 2020, the FBI served a target letter on WRIGHT,
which prompted him to get counsel.  Over the following two-plus
years, WRIGHT retained three different sets of attorneys, all of
whom received pre-indictment discovery from the government.  In
February 2022, WRIGHT and his counsel received a reverse proffer
from the government describing the government's evidence at the
time, including the $10,000 wire transfer on November 23, 2016
from PB COMPANIES to HILL's San Luis Consulting.

　　　14.　On August 17, 2022, BELSHER accepted service of a
subpoena directed to PB COMPANIES.  On September 7, 2022, PB
COMPANIES made its first production in response to that subpoena

6

USAO_00053349

SUBJECT TO PROTECTIVE ORDER

through outside counsel.[3]  Included in that production was a PDF copy of a spreadsheet with the title "Orcutt Marketplace Draw #2," which was produced as bates number PB_131.  PB_131 is attached hereto as Exhibit 2.  The spreadsheet purported to show that HILL's San Luis Consulting was owed $10,000 in connection with five invoices seeking $2,000 in payment each for work in connection with the Orcutt Marketplace project, which was in Santa Barbara County.  The invoices were dated June 1, 2016, July 1, 2016, August 1, 2016, September 1, 2016, and October 1, 2016, respectively.  As noted above, the final payment from PB COMPANIES to HILL's San Luis Consulting occurred on November 23, 2016.

15.  After receiving this PDF spreadsheet, the government asked PB COMPANIES to provide all native copies of PB_131, and on October 7, 2022, PB COMPANIES's outside counsel produced three native Excel files, PB_345, PB_346, and PB 348, that were similar, but not identical to PB_131.  None of those native Excel files contained the purported $10,000 in invoices from HILL's San Luis Consulting for his purported work on the Orcutt Marketplace project in 2016.  The metadata for the native file that had all the invoices <u>except for</u> the San Luis Consulting invoices (PB_345) indicated it was last modified by WRIGHT on May 6, 2021, after WRIGHT was aware he was a target in the corruption investigation.  After repeated requests from the

---

[3] The government, WRIGHT, and his attorneys entered into multiple agreements tolling the statute of limitations.

USAO_00053350

SUBJECT TO PROTECTIVE ORDER

government, PB COMPANIES's outside counsel was unable to produce the native version of PB_131.

16.  PB COMPANIES's outside counsel provided a privilege log indicating it received PB_131 in the same pdf format it produced in discovery on or about August 26, 2022 via a Dropbox link from BELSHER.  No further information was provided as to how PB_131 came into PB COMPANIES's possession.

17.  One of WRIGHT's attorneys produced a nearly identical copy of PB_131 via email on November 29, 2022 called "2016 09 10_Orcutt Marketplace Draw #2.pdf" (hereinafter "WRIGHT's PB_131").  WRIGHT's PB_131 is attached as Exhibit 3.  All the information contained in WRIGHT's PB_131 was identical to PB 131, including the $10,000 in invoices from San Luis Consulting. The only difference between PB_131 and WRIGHT's PB_131 was that: (1) PB_131 was searchable whereas WRIGHT's PB_131 was not; and (2) the metadata from WRIGHT'S PB 131 was created on August 22, 2022 at 10:35:20 a.m. using macOS Version 11.4 (Build 20F71) Quartz PDFContext, a PDF creator available on Apple computers. I know from this investigation that WRIGHT has previously used an Apple computer.  Metadata from PB_131 indicates that it was created using Mazira Engine 1.4.0, which I know to be a discovery software.  A subpoena to Mazira confirmed that PB COMPANIES outside counsel used their platform and software to process the discovery production in response to the government's subpoena to PB COMPANIES.

18.  For the following reasons, there is probable cause to believe WRIGHT created and falsified PB_131:

USAO_00053351

SUBJECT TO PROTECTIVE ORDER

a.    First, as described above, the metadata from
PB_131 and WRIGHT'S PB_131 indicate both were created on August
22, 2022, five days after the issuance of the subpoena on August
17, 2022.

b.    Second, on November 29, 2022, WRIGHT's counsel
produced another document purporting to be an earlier version of
WRIGHT's PB_131 with a filename of "2016.09.06_Orcutt Draw #2
Submittal Packet.pdf" (hereinafter, "the True Orcutt Marketplace
Drawsheet").  The True Orcutt Marketplace Drawsheet contains no
reference to the five invoices of $2,000 each totaling $10,000.
This document's metadata indicates it was in fact created on
September 6, 2016, unlike WRIGHT's PB_131 whose metadata shows
that it was created after the service of the subpoena on August
22, 2022.

c.    Third, other than self-serving, unsupported
statements by WRIGHT's counsel and BELSHER, there is no evidence
that HILL did a substantial amount of work on the Orcutt
project, let alone any work in 2016, as PB_131 and WRIGHT's PB
131 purport to indicate.  For example, in the thousands of text
messages exchanged between HILL and WRIGHT seized in this
investigation, the most recent discussions pertaining to Santa
Barbara and/or Orcutt occurred in August 2015 months prior to
the invoices and drawsheets produced by PB COMPANIES.  Nearly
all the messages in 2015 are from WRIGHT in which he simply
relates to HILL what he is doing on the Orcutt project.
Rebutting any claim that HILL performed work in connection with
the Orcutt project, Santa Barbara County Supervisors Peter Adam

USAO_00053352

SUBJECT TO PROTECTIVE ORDER

and Steve Lavagnino told investigators they had no recollection
of ever talking to HILL about the Orcutt Marketplace project,
nor did Bob Nelson,[4] then Adam's chief of staff.

       d.    Fourth, text messages exchanged between WRIGHT
and HILL from August 2016 through November 2016 show that the
$10,000 payment was unrelated to the Orcutt Marketplace project.
The text messages show that WRIGHT originally envisioned giving
HILL that $10,000 wire transfer in the form of a campaign
contribution funneled through a contractor because WRIGHT said
PB COMPANIES did not want to make a payment to San Luis
Consulting until after the election.   The discussions about the
campaign contribution began on August 26, 2016, the same day
WRIGHT told HILL that one of PB COMPANIES' San Luis Obispo
projects had been approved.  The payment was ultimately made
after the election to San Luis Consulting.  The text messages in
no way suggest that the $10,000 wire payment related to work
performed by HILL for the Orcutt Marketplace project.

       e.    Fifth, an analysis of the invoices included in
PB_131 demonstrate that they were cherry-picked from a plethora
of invoices generated by PB COMPANIES's Quickbooks, including
invoices related to San Luis Square and other San Luis Obispo

---

[4] Documents produced by Santa Barbara County show one
reference to HILL in an email sent by Adam's administrative
assistant to Nelson indicating that HILL sent a PB COMPANIES
representative to Adam's office to discuss the Orcutt project in
October 2014.  Investigators have not seen evidence in the
documents produced by Santa Barbara County that HILL continued
to contact Adam or Nelson's office or had other contact with
staff or supervisors concerning the Orcutt project in late 2015
or early 2016.

USAO_00053353

SUBJECT TO PROTECTIVE ORDER

projects.  For example, invoice 72[5] listed in PB_131 is
surrounded by other invoices issued on behalf of San Luis
Consulting related San Luis Square development projects called
Foster Freeze, Tank Farm, and Higuera Restaurant in San Luis
Obispo, as follows:

| Date | Invoice # | Amount | Description |
|------|-----------|--------|-------------|
| 9/10/2015 | 74 | $1,500 | Oct - Foster Freeze |
| 9/10/2015 | 73 | $250 | Oct - Tank Farm |
| 9/10/2015 | 72 | $500 | Oct - |
| 9/10/2015 | 71 | $2,000 | Oct - Orcutt Market Pl. |
| 9/10/2015 | 70 | $750 | Oct - Higuera Rest |

3.    SUBJECT ACCOUNT 1 Has Relevant Evidence of
WRIGHT's Obstruction

19.  In response to a government subpoena seeking records
concerning the creation of PB_131, PB COMPANIES outside counsel
in August 2023 produced an email sent to WRIGHT at one of his
email accounts from a PB COMPANIES employee attaching a PDF
identical to the true Orcutt Marketplace Drawsheet.  That email
was dated September 6, 2016, the same date the True Orcutt
Marketplace Drawsheet was created according to its metadata.  In
the email, the employee said that the "draw package is ready to
submit" and that the "only thing that is missing is the Axis

_____

[5] Even more suspicious is that Invoice 72 is listed on
PB_131 as being for work in June 2016, not September 2015, as
the underlying invoice indicates.  Nor is it for $2,000 or even
tied to the Orcutt Marketplace project.

USAO_00053354

SUBJECT TO PROTECTIVE ORDER

invoice." There is no mention of any missing invoices related to San Luis Consulting or HILL.

####    4.   The Indictment

20.   On October 4, 2023, a federal grand jury returned a 3-count indictment against WRIGHT for the aforementioned conduct. WRIGHT is charged with multiple Subject Offenses -- namely, 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 1519 (Falsification of Records), and 18 U.S.C. § 1503 (Obstruction of Justice).

21.   The indictment, attached hereto as Exhibit 1 and incorporated herein by reference, remains under seal pending the arrest of WRIGHT.

**B.   WRIGHT's Investment Fraud Scheme**

22.   WRIGHT and BELSHER are or have previously been defendants in three separate civil lawsuits that allege fraudulent conversion or fraudulent conveyance in connection with real estate development projects in San Luis Obispo County -- Chase, et al v. Belsher, et al., 18 CVP 0325, Judkins, et al v. Belsher, et al., 18 CV 0689, and Sheppel, et al., v Belsher, et al, 18 CV 0586.[6]

23.   Based upon interviews I and other investigators have conducted with various participants in a real estate acquisition and development project in Texas, an escrow officer responsible for handling the acquisition, investors in the project, documents produced by those individuals, and financial records, I believe there is probable cause to believe that over the past

---

[6] WRIGHT is named by his former last name in all three lawsuits, Petetit.

USAO_00053355

SUBJECT TO PROTECTIVE ORDER

two years, WRIGHT has orchestrated a wire fraud scheme in which he converted over a $1 million in investor funds.

24. The following are relevant entities in this scheme:

a. Lang Family Ranches, L.P. ("LFR") is a Texas entity established by Carl R. Lang ("Lang") as a member and manger on October 15, 2003. LFR owns two tracts of land in Dripping Springs, Texas that total approximately 44 acres ("the Lang Ranch").

b. DL Consulting, LLC ("DLC") is a Rhode Island entity established by Diamandia Lingos ("Lingos") as its sole member on April 11, 2018.

c. Mission Oak Group, LLC ("MOG") is a California entity established by John J. Pena ("Pena") as its sole member and manager on August 16, 2018.

d. WRIGHT Equity Limited Pomona Fund (WRIGHT Equity") is a Delaware corporation established by WRIGHT on June 15, 2021. At the time of incorporation, WRIGHT identified the directors of the company as himself and Pena.

e. Davy Crockett Estates, LLC ("Davy Crockett") is a Texas entity, established by Lingos as its sole managing member on January 26, 2022.

f. Mission Oaks Group Robles Ranch Dripping Springs, LLC ("MOGRRDS") is a Delaware entity established by WRIGHT with MOG as its sole member on February 15, 2022. Although Pena was listed as the "responsible party" and sole member of the parent entity, MOG, WRIGHT's SUBJECT ACCOUNT 1, phone number, and credit card were used to create the entity.

13

USAO_00053356

SUBJECT TO PROTECTIVE ORDER

1.    Dripping Springs Property Development Project

25.    By August 2021, Lingos had identified the Lang Ranch
as a potential property to develop for the construction of
luxury homes.

26.    Due to her lack of experience and WRIGHT's claims that
he had worked multimillion dollar real estate development
projects in the past, Lingos agreed to retain WRIGHT's
consulting services of the project for a period of 12 months in
return for a $50,000 up-front fee and $108,000 payable in
installments over the course of the year.  On or about November
3, 2021, a contract between DLC and WRIGHT Equity, signed by
Lingos and WRIGHT, memorialized the agreement.

2.    Initial Attempted Acquisition of the Lang Ranch

27.    On February 4, 2022, LFR and Davy Crockett entered
into a commercial contract, signed by Lang and Lingos, for the
purchase and sale of the Lang Ranch for $6,350,000 (the "PSA
Contract").

28.    Sometime after the creation of MOGRRDS, the escrow
company, Independence Title received a Company Agreement for
Davy Crockett dated February 14, 2022 and signed by Pena that
stated Davy Crockett was solely owned by MOGRRDS which was owned
by MOG which was owned by Pena.

29.    On April 11, 2022, Lingos opened a MOGRRDS bank
account ending in #1358 (the "MOGRRDS account") and was its sole
signatory.  According to Lingos, she gave WRIGHT access to the
account (and all other accounts Lingos had access to apart from
DLC) for the purpose of paying bills in connection with the

14

USAO_00053357

SUBJECT TO PROTECTIVE ORDER

project.  Lingos never agreed that WRIGHT could use such accounts to pay for anything other than bills for the project.

30.  On April 25 and June 17, 2022, LFR and Davy Crockett amended the PSA Contract to extend the closing date to August 15, 2022.  Lang signed these amendments on behalf of LFR.  WRIGHT signed these amendments on behalf of Davy Crockett.

31.  As required by the PSA Contract and its amendments, earnest money was transferred to escrow as follows:

| Date | Amount | Total | Source |
|------|--------|-------|--------|
| 2/14/22 | $63,000 | $63,000 | DLC |
| 3/17/22 | $25,000 | $88,000 | DLC |
| 6/21/22 | $224,000 | $312,000 | MOGRRDS |

32.  The PSA Contract provided that if the buyer defaulted, the seller could terminate the contract and receive the earnest money as liquidated damages.  The June 17 PSA Contract amendment stated that $200,000 of the additional earnest money was non-refundable but would be applied to the purchase price of the property while $24,000 of the earnest money was neither refundable nor applicable to the purchase price of the property.  The amendment also required Davy Crockett to pay half of the real estate broker's 4% commission.

33.  On August 15, 2022, no one appeared on behalf of Davy Crockett at closing and no additional funds were deposited into escrow to complete the transaction.  On August 24, 2022, counsel for Lang notified Lingos and WRIGHT of the default and LFR's termination of the PSA Contract.  Further, LFR made a demand for

USAO_00053358

SUBJECT TO PROTECTIVE ORDER

the $312,000 in earnest money held in escrow as liquidated damages.

34.  On October 20, 2022, Independence Title released $24,000 of the earnest money to LFR.  On October 26, 2022, LFR sued Davy Crocket for breach of contract, seeking the payment of the $288,000 remainder as liquidated damages, plus attorneys' fees and costs.

### 3.  Fraudulent Procurement of Investor Funds

35.  During the period January through October 2022, Lingos, Pena, and WRIGHT raised approximately $2 million of investor money through their businesses DLC, MOGRRDS, and WRIGHT Equity.

36.  Investors were generally provided a subscription booklet for their investment to be executed by the investor and WRIGHT, as "authorized agent" for MOG, manager of MOGRRDS. Investors with questions were directed to contact WRIGHT.  By signing the subscription agreement, the investor acknowledged having read an April 12, 2022 private placement memorandum that allowed membership interests in MOGSRRDS to be offered without registering with the SEC.

37.  Based upon interviews of investors conducted to date, it is not clear if all investors received the private placement memorandum.  Regardless, the subscription agreement and associated documents show that the general partners of MOGRRDS would retain ownership of 70% of the project while the remaining 30% would be offered to investors to be engaged as limited partners.  The cost of the 30% shares offered to investors

16

USAO_00053359

SUBJECT TO PROTECTIVE ORDER

totaled $3.5 million.  The costs of the project were estimated
at $13.1 million ($6.3 million for the land purchase and $6.8
million for development) with anticipated gross sales of the
developed parcels estimated at $24.1 million.

    38.  The private placement memorandum stated that the cash
proceeds received from the offering would be disbursed as
follows:

| Category | Estimated Use of Proceeds |
|---|---|
| Survey Final Map | $55,000 |
| HOA and CCRC's | $15,000 |
| Due Diligence Acquisition Fee | $178,000 |
| Legal / Legal Final Map | $75,000 |
| Performance / Map Guarantee Bond 1.2% | $56,400 |
| Arborist | $5,000 |
| Marketing - Graphics - Digital - Print | $60,000 |
| Overhead | $318,000 |
| Office and Admin | $82,500 |
| LS and Amenity Architect | $45,000 |
| Soils | $6,500 |
| Custom Spec House Plans (1-2) | $295,000 |
| Standard + House Plans (2) | $210,000 |
| Civil Construction Drawings | $135,000 |
| Brandon Mann PM and Expedite | $59,280 |
| Jon Thompson Expedite | $45,000 |

USAO_00053360

SUBJECT TO PROTECTIVE ORDER

| Category | Estimated Use of Proceeds |
|----------|---------------------------|
| Contingency | $82,034 |
| **Total** | $1,640,680 |

39.  According to that same memorandum, proceeds received from the offering in excess of the amounts shown above would be applied, together with additional funds raised, "to costs related to the acquisition and horizontal development of the property."

40.  Based upon my familiarity with this investigation, "horizontal costs" refer to excavation, infrastructure, and landscaping while "vertical costs" refer to the building of structures, in this case, luxury homes, on the property.

41.  On October 3, 2022, despite the termination of the PSA Contract, WRIGHT received into his WRIGHT Equity account, $250,000 from an investor.  I have interviewed the investor, who provided a copy of his subscription agreement and other documentation received from WRIGHT.  The investor informed me that he was completely unaware that the PSA Contract had been terminated and that the seller had sued Davy Crockett for forfeiture of earnest money provided by other investors. According to the investor, WRIGHT told him that his funds were being used for construction work on the property, and that WRIGHT urged him to invest more money to purchase a subdivided lot on the property.

USAO_00053361

SUBJECT TO PROTECTIVE ORDER

### 4.  Diversion of Investor Funds

42.  Upon receipt of investor funds, WRIGHT promptly diverted much of the money to his personal benefit.  Between April 20 and October 6, 2022, out of approximately $1.34 million in investor funds deposited into the MOGRRDS bank account, WRIGHT directed approximately $700,000 to his company WRIGHT Equity, $53,000 to a law firm he retained in connection with the government's bribery investigation, and approximately $21,000 to his personal bank and credit card accounts.

43.  Out of roughly $700,000 transferred to WRIGHT Equity during this period, WRIGHT directed approximately $400,000 of these funds to his personal bank, credit card, and automobile lease accounts, $16,000 to an account in his wife's name, and $55,000 to two law firms WRIGHT retained in connection with the government's bribery investigation.

44.  Out of the $250,000 of investor funds transferred directly into the WRIGHT Equity account by the October 3 investor, WRIGHT directed approximately $110,000 to his personal bank account, $70,000 to a law firm WRIGHT retained in connection with the government's bribery investigation, $7,857 to BMW financial services to make payments on an automobile lease, $3,000 to pay an Applecard account in his name, and $33,684 to BELSHER, his alleged co-conspirator referenced in the indictment.  Out of the $110,000 sent to his personal bank account, the overwhelming majority of that money paid debt on WRIGHT's personal credit card which, with one exception, appear

19

USAO_00053362

SUBJECT TO PROTECTIVE ORDER

to be personal expenditures.  The lone exception was a $6,000 payment to Thompson, the civil engineer.

**C.    WRIGHT's Bank Fraud Scheme**

45.    Based upon interviews I and other investigators have conducted with various participants in the Davy Crockett development project, the escrow officer responsible for coordinating the receipt and disbursement of funds, representatives of lending institutions solicited to finance the project, and documents obtained from the lending institutions, I believe there is probable cause to believe that over the past year, WRIGHT has attempted to defraud multiple lending institutions of several million dollars and that this scheme to fraud is currently in progress.

46.    By March 3, 2022, WRIGHT began soliciting financial institutions to provide the funds necessary to finance the purchase of the Lang Ranch as well future development of the land.  Pena agreed to act as the sole guarantor of the loan. Prior to the default on the PSA Contract in August 2022, Davy Crockett submitted loan applications to South Star Bank, Texas Regional Bank, and Silver Arch Capital Partners, none of which closed.

1.    Misrepresentations About the Status of the Project

47.    Notwithstanding the August 16, 2022 notice from Lang that he had terminated the PSA Contract due to buyer's breach, on August 29, 2022, WRIGHT contacted Builders Capital, a private lender, to fund the acquisition and development of the Lang

USAO_00053363

SUBJECT TO PROTECTIVE ORDER

Ranch.  WRIGHT led Builders Capital to believe that Lang and

Davy Crockett were "working on an extension" for the PSA

Contract.  In fact, Lang had terminated the PSA Contract, was

pursuing damages for Davy Crockett's breach, and had rejected

entreaties by WRIGHT to resurrect the deal.

48.  As part of his efforts to satisfy contingencies

imposed by Builders Capital with respect to the loan, WRIGHT

misrepresented the status of obtaining approval from Hays County

public officials of the development plan.  For example, on

November 9, 2022, WRIGHT forwarded to Builders Capital an April

2022 email from the Hays County Texas General Counsel stating

that he had no edits to the MOG proposed development agreement

along with a comment from WRIGHT's attorney that "Looks like we

are good to go."  In fact, on November 7, 2022, two days prior

to his submission to the lender, WRIGHT caused the submission of

the proposed development agreement without Lang's knowledge.

Upon discovery, Lang had the application revoked.  Lang's

position with respect to the development agreement and the sale

is memorialized in a November 12, 2022 conversation with Jon

Thompson ("JT"), a civil engineer retained in connection with

the project:

| Sender | Message |
|--------|---------|
| JT | Ryan has been wanting to continue with the development agreement with the County even though he doesn't have a contract. I thought it was crazy.  […]  Ryan thinks he can still put everything together and come back to you to buy. |
| Lang | Absolutely not I will call Monday it is fraud using my company[…] |

21

USAO_00053364

SUBJECT TO PROTECTIVE ORDER

| Sender | Message |
| --- | --- |
| JT | Ryan makes it sound like his attorney and your attorney are talking or that they know each other. I'm not sure where he gets the idea that you will still sell it to him. |
| Lang | I filed a lawsuit  […]  He is a fraud And a liar |
| JT | What is he thinking? Almost like he thinks he can come back and have his paperwork done and a loan and somehow convince you to sell it. I still don't know what in the world they think in California. No contract means no sale. |
| Lang | Kill it and have them send out an explanation. I don't want the neighbors calling me. |

49.  WRIGHT also deceived the lender as to the timeline for
completion of the development plans.  On November 16, 2022,
Builders Capital spoke with the civil engineer and discovered
that work on the final plans had not been started, it would take
4-6 weeks to have a plan ready to submit, and would take another
2-4 months to get development permits from the county.  Builders
Capital confronted WRIGHT with respect to his misrepresentation,
explaining that:

> From our previous conversations with you, it was
> communicated that the final approved development plans
> would be approved by the city simultaneously with the
> issuance of the site work permit. […]  This is a
> deviation from what you communicated to Sarah and I,
> which in turn is also a deviation from what was
> communicated to our approval committee. Closing the
> loan transaction prior to having approved development
> plans with a 2-4 month gap between approval and permit
> issuance creates concern and increased risk for us as
> the lender. Based on the above timeline you would not
> even be able to start development work for 3.5 months
> at best and potentially 6 months after closing.

    2.    Forfeiture of Investor Funds

50.  In order to begin negotiations to resurrect the sale,
WRIGHT agreed to forfeit to LFR all of the earnest money

USAO_00053365

SUBJECT TO PROTECTIVE ORDER

previously deposited into escrow, all of which originated with
investor funds.  On December 29, 2022, Thompson informed Lang
that he received a telephone call from WRIGHT who asked him to
convey that "he is willing to release the money from escrow if
you'd consent to him getting the Development agreement approved
by the County and […] he said he understands he'd have to pay
more for your trouble -1031 and lawyers."  In response, Lang
agreed to negotiate the matter in good faith.  On January 4,
2023, Thompson informed Lang that he just spoke to WRIGHT and
that he "understands what he has to do - release the money from
escrow before anything else happens. Then a new deal /contract
can be negotiated and you can take his call."  On January 12,
2023, the earnest money was transferred from escrow to Lang.

51.  After negotiations, WRIGHT agreed to pay Lang damages
in addition to the release of the earnest money.  On February
17, 2023, WRIGHT informed Lang that "I think we have a deal.
Here's the details below, and before you get into the weeds on
this just know this offer includes the 312,000 already released
to you. [...] All of the following expenses on top of the
original purchase price of the $6.35 million must be allocated
in the contract as 'damages to seller' for settlement purposes
[...]."  He then listed out the following points: "1031 exchange
money of 135,000 which I told you I would pay in honor,
increases the purchase price [;]  Joshes commission of 2% which
we pay [;] The additional 150,000 plus or minus that gets us to
the 6,635,000 is included in the 'damage to seller'"[.]"  With
respect to the earnest money already forfeited, WRIGHT

23

USAO_00053366

SUBJECT TO PROTECTIVE ORDER

acknowledged the funds would not be applied to the new purchase agreement, saying that "312,000 even if it is not applied, needs to be mentioned in the contract because we will in fact need to allocate that money as an immediate loss, and not part of property cost."

### 3.    The Second PSA Contract

52.    On February 20, 2023, Lang and Pena executed a new PSA Contract between Davy Crockett and LFR.  Consistent to the terms laid out by WRIGHT, the price was increased to $6,635,000 and the following amounts were considered damages to the seller for the breach of the prior contract: the $312,000 previously forfeited from escrow, $135,000 for Lang's damages related to a 1031 exchange fee, and $150,000 in lieu of paying Lang interest on the purchase price.  In addition, Davy Crockett agreed to pay the real estate broker's two percent fee.

53.    Due to WRIGHT's inability to obtain a loan from Builder's Capital, the new PSA Contract was extended on three occasions up to June 16, 2023.  Two transfers of new earnest money were made in the amounts of $100,000 and $25,000 on March 2 and March 20, 2023, respectively.  The former transfer was issued by Pena at WRIGHT's request.

### 4.    Misrepresentations as to Costs Paid and Equity Added to the Project

54.    A consistent impediment to closing the loan with Builder Capital was the borrower's inability to come up with enough funds to provide cash for a down payment and sufficient reserves to demonstrate an ability to make payments on the loan.

USAO_00053367

SUBJECT TO PROTECTIVE ORDER

This "cash to close" was necessary and material to the lender because the loan to value required by lender could not exceed 60 percent.

55.  Beginning in November 2022, WRIGHT began falsely representing to Builders Capital that certain funds had been expended in relation to the project which increased the value of, and the borrower's equity in, the project.  Such "costs paid to date" would lower the loan to value ratio and thereby reduce the amounts needed for "cash to close."

56.  On December 16, 2022, WRIGHT provided Builders Capital with a backdated invoice dated March 21, 2021 to DLC and "Mission Oaks Robles Ranch, LLC" for "Development Planning, Entitlement Processing, Project Management Expedite & Value Engineering, Debt Financing" along with the message, "Here is the invoice I have for the payments made. I also added some reimbursements and the commission to this as well, but can change if needed."  The attached invoice listed the following amounts, with the first two entries under "Amount Previously Paid" and the latter two entries listed under "Amount Due This Invoice," as follows:

"Original Contract Fees Applied to Purchase Price = $213,000

Development Planning Fees Applied to Purchase Price = $924,378

Reimbursement Estimate = $7,500

Origination Fee's = $540,000"

57.  The invoice could not be genuine because MOGRRDS did not exist as of March 2021, and Lingos, the owner of DLC, did

25

USAO_00053368

SUBJECT TO PROTECTIVE ORDER

not even meet WRIGHT until July 2021.  Based upon interviews of Pena and Lingos, the principals of these two companies, there was never any agreement to pay WRIGHT such fees in connection with the project.  DLC agreed to pay WRIGHT Equity a total of $158,000 to provide mentorship and consulting services to Lingos but the total "payments made" to WRIGHT pursuant to the contract totaled less than $100,000.  Pena believed that WRIGHT would be entitled to a commission for his work, but he never agreed to pay a commission prior to the closing of escrow.  Moreover, Pena stated that the nearly $700,000 transferred from MOGRRDS to WRIGHT Equity was made without his knowledge.

58.  Based upon my familiarity with the case, the "Origination Fee's [sic]" pertains to WRIGHT's statements to the lender that he would provide Davy Crockett with a subordinated loan to help finance the deal.  I have seen no evidence to suggest that WRIGHT possessed sufficient capital to finance such a loan nor that he reached an agreement with either of the principals to secure an "origination fee."

59.  On February 28, 2023, notwithstanding the terms of the new PSA Contract and WRIGHT's acknowledgement to Lang that, with respect to the $312,000 in earnest money, the buyer would "in fact need to allocate that money as an immediate loss, and not part of property cost," WRIGHT represented to Builders Capital that that the $312,000 was a cost paid to date for the project, stating "There has been additional monies fully released and paid to the release price as follows, either paid through a

26

USAO_00053369

SUBJECT TO PROTECTIVE ORDER

trust / escrow account or directly to the seller, $385,000.00 + $312,000.00."

60. On March 31, 2023, WRIGHT provided Builders Capital with a MOGRRDS Quickbooks report in pdf format that detailed $1,217,984.38 in transactions he claimed were related to the project. I have reviewed these transactions and have reconciled the following transactions that do not pertain to the project, but rather payments to criminal defense attorneys retained by WRIGHT and PB COMPANIES in connection with the government's bribery investigation:

| Date | $ Amount | WRIGHT Accounting Description | Reconciled Transaction |
|------|----------|-------------------------------|------------------------|
| 9/19/22 | 25,000 | Applied to Purchase Price Transfer to WRIGHT Equity / OH PM Entitlement Fee - Trust Account IF RW | WRIGHT Equity to Isaacs Friedberg |
| 10/25/22 | 35,000 | Applied to Purchase Price Transfer to WRIGHT Equity / OH PM Entitlement Fee - Trust Account IF RW | WRIGHT Equity to Isaacs Friedberg |
| 11/9/22 | 25,000 | Applied to Purchase Price Transfer to WRIGHT Equity / OH PM Entitlement Fee - Trust Account IF RW | WRIGHT Equity to Isaacs Friedberg |
| 11/17/22 | 27,347 | Applied to Purchase Price Transfer to WRIGHT Equity / OH PM Entitlement Fee - Trust Account Summ... | WRIGHT Equity to Summa LLP |
| 11/30/22 | 17,500 | Applied to Purchase Price Transfer to WRIGHT Equity / OH PM Entitlement Fee - Trust Account IF RW | WRIGHT Equity to Isaacs Friedberg |

5.  Temporary Inflation of Applicant Bank Account

61. By June 27, 2023, according to a term sheet prepared by Builders Capital, the total loan commitment for the

27

USAO_00053370

SUBJECT TO PROTECTIVE ORDER

acquisition of the Lang Ranch and the development of the
property was set at $27,121,508 to be provided over a 24-month
term.  The "costs paid to date (actual spend)" were identified
as $1,699,417.

62.  In late June and early July 2023, WRIGHT engaged in a
scheme to artificially inflate a bank account to convince
Builders Capital that the borrower had sufficient cash to close
the deal.  I have interviewed David Bader, one of WRIGHT's
investors.  According to Bader, after having invested $400,000,
WRIGHT solicited him for more funds to help close the loan.
Bader was not willing to invest additional money but in response
to WRIGHT's request, he agreed to open an account at Cattle Bank
& Trust, where he maintained his own accounts, in the name of
MOGRRDS and deposit funds into the account to show the lender
that MOGRRDS had sufficient funds to close.  The deposits were
funded by two lines of credit secured by properties owned by
Bader's companies.  On two occasions, Bader engaged in financial
transactions that temporarily inflated a bank account in the
name of MOGRRDS, a company he did not own nor operate, as
follows:

| Date | Credit | Debit | Balance |
|------|--------|-------|---------|
| 6/14/2023 | $283,459 | | |
| 6/14/2023 | $250,000 | | $533,459 |
| 6/20/2023 | | -$283,000 | |
| 6/20/2023 | | -$250,187 | |

USAO_00053371

SUBJECT TO PROTECTIVE ORDER

63.   On June 30, 2023, one of WRIGHT's business associates, Jason Blankenship, provided Builders Capital with a June 14, 2023 electronic statement for the Cattle Bank & Trust account showing that MOGRRDS had an account balance of over $533,000. At the time of Blankenship's email, the funds had already been removed and the balance was near zero.   Nevertheless, Blankenship claimed that the funds were "Available in Bank owned by Sponsor Entity (Mission Oaks Group Robles Ranch Dripping Springs)."

64.   On July 5, 2023, Builders Capital responded to Blankenship that it would fund the loan if it had evidence of sufficient funds as follows: "Thanks for the breakdown of the post close 10%. This covers post close numbers and now I will just need to know and have evidence of the 1.5M is cash to close that is estimated. Either funds moved to escrow for the closing or funds transferred into borrower accounts. Either way I need this documentation of where the 1.5M is coming from before I can put the file back into credit underwriting."

65.   The next day, July 6, 2023, Bader repeated the task of temporarily inflated the Cattle Bank & Trust MOGRRDS account as follows:

| Date | Credit | Debit |
|------|--------|-------|
| 7/6/2023 | $533,000 | |
| 7/10/2023 | | −$533,000 |

66.   On July 12, 2023, in response to Builders Capital's request for evidence of the $1.5 million cash to close,

29

USAO_00053372

SUBJECT TO PROTECTIVE ORDER

Blankenship emailed Builders Capital copies of two cashier's
checks Bader had received.  Blankenship claimed that Bader was
willing to deposit this money into escrow.  In addition,
Blankenship provided a copy of a cashier's check made out to the
escrow company, Patten Title, from Bader's company.  As stated
above, my interview of Bader demonstrated that he had no
intention to deposit additional money into escrow.  In fact,
Bader informed me that he was very anxious to see the loan
funded so that he would have title to a portion of the Lang
Ranch and then have options, such as selling his shares to
recoup his investment.

### 6.   Bank Loan Application with Nexa Mortgage

67.  WRIGHT recently attempted to secure a loan through a
mortgage broker, Axen Mortgage, LLP.  On or about August 4,
2023, WRIGHT made false representations to this broker in an
attempt to secure a loan to complete the purchase of the Lang
Ranch.  WRIGHT assertions were memorialized in an email from the
broker to the potential lender, Security State Bank & Trust
that: "Misson has put in $862K cash equity direct to seller (we
canshow transfers) as well as another $1M in soft cost spent on
soils, plans, permits, attorneys and consulting fees."

### 7.   WRIGHT's Use of Cellular Devices

68.  From the inception of the scheme, WRIGHT used the
telephone number, 310-844-5918 ("SUBJECT TELPHONE 1"), to engage
in text message exchanges with Lingos, Lang, and others.  WRIGHT
also used this number when he established WRIGHT Equity as a
legal entity.

USAO_00053373

SUBJECT TO PROTECTIVE ORDER

69.  Beginning in January 2023, WRIGHT began using the telephone number, 310-962-0098 ("Subject Telephone 2"), to engage in text message exchanges with Lang, Independence Title, Patten Title, and others.

70.  Notwithstanding his acquisition of a new cellphone, WRIGHT continued to use the old cellphone as well.  For example, on July 7, 2023, WRIGHT responded to a text Lang sent to the 310-844-5918 cellphone stating, "Carl saw your text on the other phone just now will fill you in tomorrow".

8.   <u>WRIGHT's Use of Cellular Devices</u>

71.  From the inception of the scheme, WRIGHT used the telephone number, 310-844-5918 ("SUBJECT TELPHONE 1"), to engage in text message exchanges with Lingos, Lang, and others.  WRIGHT also used this number when he established WRIGHT Equity as a legal entity.

72.  Beginning in January 2023, WRIGHT began using the telephone number, 310-962-0098 ("Subject Telephone 2"), to engage in text message exchanges with Lang, Independence Title, Patten Title, and others.

73.  Notwithstanding his acquisition of a new cellphone, WRIGHT continued to use the old cellphone as well.  For example, on July 7, 2023, WRIGHT responded to a text Lang sent to SUBJECT TELEPHONE 1 stating, "Carl saw your text on the other phone just now will fill you in tomorrow".

9.   <u>WRIGHT's Use of Computers</u>

74.  Although WRIGHT informed Lingos by text message on December 15, 2022, that he "emptied my trash Can on my computer

31

USAO_00053374

SUBJECT TO PROTECTIVE ORDER

and lost lots of our files," it is clear that "lots of" did not constitute "all."

75.    Throughout the period September 2022 through July 2023, WRIGHT forwarded by email numerous documents to Builders Capital related to the project including contracts, invoices, bank statements, and escrow documents.  On March 31, 2023, WRIGHT provided Builders Capital with a MOGRRDS Quickbooks report in pdf format that detailed transactions he claimed were related to the project.

76.    On October 11, 2023, Pena sent me a message stating, "I have been asking Ryan for over 6 months for the financials, PNL receipts etc. from the Austin deal and he sent it to me." In that email, Pena linked a file that included an excel spreadsheet he received from WRIGHT the appears to be a general ledger setting forth dozens of transactions related to the project (the "General Ledger").  Those transactions include payments made to criminal defense attorneys retained by WRIGHT in connection with the government's corruption investigation that are falsely characterized as "additional contingency."

77.    Documents stored on WRIGHT's computer apparently include messages synced from his cellphones.  On January 29, 2023, WRIGHT sent a text to Lang from cellphone number 310-844-5918 stating, "Let me get home and get to my calendar, got a new iPhone and none of its synced up at the moment."

32

USAO_00053375

SUBJECT TO PROTECTIVE ORDER

    10.   <u>WRIGHT Stays at the SUBJECT PREMISES and Drives the SUBJECT VEHICLE</u>

78.  According to California Department of Motor Vehicle records, WRIGHT currently lives at 450 N. Palm Unit 206, Beverly Hills, CA 90210 (the "Beverly Hills Unit."). According to BMW Financial Services, NA LLC records, WRIGHT leased two BMWs, a 2021 BMW registered to FSVT LSR, WRIGHT Ryan J, LSE at the Beverly Hills Unit with a California License Plate of 8XAR092 ("BMW 1"); and a 2021 BMW registered to FSVTG LSR, WRIGHT, Ryan Joseph LSE at the Beverly Hills Unit with a California License Plate of 8XIJ449 ("the SUBJECT VEHICLE"). Lessee information for both vehicles was from July 2021 and have not been updated since, and California Department of Motor Vehicle records indicate both SUBJECT VEHICLE and BMW 1 are still registered to the Beverly Hills Unit.

79.  While these records indicate that WRIGHT lives at the Beverly Hills Unit, I believe he currently resides at the SUBJECT PREMISES for the following reasons:

    a.  On October 12, 2023, I searched commercial real estate websites, including Realtor.com and Trulia.com, for the Beverly Hills Unit and learned that it had active rental listings. A review of the listings on October 27, 2023 found the Beverly Hills Unit was still listed for rent. Trulia.com show the property has been on the market for 37 days. On October 12, 2023, FBI SA Michael Rousseve contacted the property management company listed on the real estate websites, Los Angeles Property Management Group, and was advised by the

USAO_00053376

SUBJECT TO PROTECTIVE ORDER

representative who answered the phone that the residence was
vacant and currently undergoing repairs.[7]

      b.   A review of San Luis Obispo Sheriff's Department
License Plate Reader information shows BMW 1 has been in the San
Luis Obispo County area since at least August 1, 2023 and most
recently on October 9, 2023.  SUBJECT VEHICLE was also located
in the San Luis Obispo CA during the first week of October 2023.

      c.   On October 13, 2023, the Honorable Karen S.
Stevenson, Chief United States Magistrate Judge, signed an
amended warrant authorizing the disclosure of historical and
prospective cell-site information, in case number 2:23-MJ-5238
(the "Cell-Site Warrant").[8]  Based on a review of the prospective
cell-site information, the FBI learned the following:

      i.   Between October 13, 2023 and October 22,
2023, SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 (collectively,
the "SUBJECT TELEPHONES"), prospective cell-site data indicated
the SUBJECT TELEPHONES were frequently located overnight near

---

[7] A recent court filing made by WRIGHT in a civil case
suggests he no longer lives at the Beverly Hills Unit.  As
discussed above, WRIGHT is a defendant in a civil lawsuit in the
County of San Luis Obispo (18CVP-0325) alleging that he and
others defrauded real estate investors.  Information obtained
from the San Luis Obispo County Court records showed that WRIGHT
recently advised the court that he had moved in the past few
months and listed the address of 450 N. Palm Drive, #206, Indian
Wells, CA 92210.  This address is different than the Beverly
Hills Unit in that it provides both the wrong city and zip code.
A query of the United States Postal Service open-source records
for this address returned that the address could not be found.

[8] In the government's initial application and proposed
warrant (but not affidavit), there was a typographical error
with respect to SUBJECT TELPHONE 1.

USAO_00053377

SUBJECT TO PROTECTIVE ORDER

the residence of Blankenship, 831 Castillo del Mar, Arroyo Grande, California ("BLANKENSHIP RESIDENCE"). An analysis of historical cell-site records produced in response to the Cell-Site Warrant conducted by a Cellular Analysis Survey Team special agent found that from August 1, 2023 through October 12, 2023, SUBJECT TELPHONE 2 was often located overnight near the BLANKENSHIP RESIDENCE. Surveillance in the vicinity of the BLANKENSHIP RESIDENCE on October 17, 2023 and October 18, 2023 spotted the SUBJECT VEHICLE in the area. On October 20, 2023, SA Rousseve observed the SUBJECT VEHICLE parked at the BLANKENSHIP RESIDENCE.

      ii.  On October 18, 2023, SA Rousseve saw WRIGHT driving the SUBJECT VEHICLE.

      iii. From October 22, 2023 through October 27, 2023, prospective cell-site data provided in response the Cell-Site Warrant for the SUBJECT TELEPHONES has placed both devices overnight in the west-side of Grover Beach, California, which is where the SUBJECT PREMISES is located.

      iv.  On October 24, 2023, at approximately 1:35 p.m., FBI SA Rousseve conducted surveillance at the SUBJECT PREMISES and saw the SUBJECT VEHICLE parked near the SUBJECT PREMISES. Prospective cell-site data for the SUBJECT TELEPHONES indicated the devices were in the area of the SUBJECT PREMISES.

      v.  On October 25, 2023, FBI SA Rousseve saw WRIGHT park the SUBJECT VEHICLE near the SUBJECT PREMISES, get out of the vehicle, and enter the SUBJECT PREMISES through front door without knocking. Approximately ten minutes after WRIGHT

USAO_00053378

SUBJECT TO PROTECTIVE ORDER

entered the SUBJECT PREMISES, I saw a man who appeared to be in his 60s with grey hair and a moustache leave the SUBJECT PREMISES and enter a Toyota Truck with California license plate number 22767F2. According to California Department of Motor Vehicle records, the truck is registered to Michael Robert Baron. According to California Department of Motor Vehicle records, Baron lives at the SUBJECT PREMISES. Investigators are unaware of the connection between WRIGHT and Baron.

vi. On October 26, 2023, FBI SA Rousseve saw the SUBJECT VEHICLE parked near the SUBJECT PREMISES at approximately 8:20 a.m. and again on October 27, 2023 at approximately 8:16 a.m. As noted above, prospective cell-site data for the SUBJECT TELEPHONES indicated both devices were in the area of the SUBJECT PREMISES overnight between October 26 and October 27, 2023.

### IV. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

80. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the

USAO_00053379

SUBJECT TO PROTECTIVE ORDER

Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures

37

USAO_00053380

SUBJECT TO PROTECTIVE ORDER

are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

81.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

82.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

38

USAO_00053381

SUBJECT TO PROTECTIVE ORDER

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress RYAN WRIGHT's thumb and/or fingers on
the device(s); and (2) hold the device(s) in front of RYAN
WRIGHT's face with his or her eyes open to activate the facial-,
iris-, and/or retina-recognition feature.

39

USAO_00053382

SUBJECT TO PROTECTIVE ORDER

83.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V.    **CONCLUSION**

84.    Based on the foregoing, I request that the Court issue the requested warrants.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  27th day of October  , 2023.


HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE

40

USAO_00053383

SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 5

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry _____01/29/2024_____

John Pena (Pena) was interviewed telephonically. Pena was familiar with
the identity of the interviewing Agent and the nature of the interview. Also
present during the call was Assistant United States Attorney (AUSA) Daniel
O'Brien. Pena provided the following information:

Pena met Ryan Wright (Wright) about three and half years ago and Wright
has ruined his life. Wright has crushed Pena's credit and he convinced Pena
and his family to invest in bad deals. At some point, Wright told Pena that
he was being charged with paying a Commissioner.

Pena thanked AUSA O'Brien for a letter that AUSA O'Brien provided to
Pena. Pena wanted to move forward on the the Dripping Springs and Orcutt
projects without Ryan Wright (Wright). Pena does not want to lose the money
he invested in the projects. Pena still wants to purchase the Dripping
Springs property. If he doesn't purchase the property, then the investors he
brought into the deal will lose their money. Pena has no loyalty to Wright.
If Wright did wrong, Pena will cooperate and testify against him.

The only bank Pena was involved with the Dripping Springs project was
Security State Bank & Trust (SSBT). Pena spoke with Jason Nebgen (Nebgen).
Pena believed SSBT approved the loan and was ready to move foward.

Wright was helping Pena secure funding for his development projects. Pena
told Wright he wanted everything above board. Pena recalled Wright
describing an instance when he inflated the value of an asset to obtain a
loan. Pena told Wright he wanted to be straight. Pena told Nebgen about an
asset that Wright inflated in the Dripping Springs loan application
package.

Wright mislead Pena on the Orcutt project. Ben Nikfarjam (Nikfarjam) owns
the Orcutt property and he is a mentor to Wright. Pena entered the deal with
Nikfarjam in good faith and they are partners in the Orcutt project. About
five months ago, Nikfarjam told Pena that Wright was under investigation.
Pena was upset Nikfarjam did not tell him about Wright's legal troubles
before they became partners. Pena paid Nikfarjam $400k and he is paying

Investigation on __10/25/2023__ at __Santa Maria, California, United States (Phone)__

File # ▮▮▮▮▮▮▮                                   Date drafted __01/26/2024__

by __Dieter F. Willkomm__

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

USAO_00075167

SUBJECT TO PROTECTIVE ORDER

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of  (U) John Pena - 10/25/2023 _____ , On  10/25/2023 , Page  2 of 2

Nikfarjam's property taxes. In addition, Pena guaranteed "a bunch of stuff" that he is liable for.

AUSA O'Brien told Pena that he was entitled to do whatever he wanted to do with his money.  AUSA O'Brien could not give Pena any legal advice and he could lose his job if he gave him legal advice.

Pena believed he was the purchaser on the Dripping Springs purchase agreement. AUSA O'Brien stated there were questions regarding the purchase contract. During the investigation, dozens of people have been interviewed and many documents have been collected. It appears the entity on the purchase contract may not have had any right to purchase the Dripping Springs property. Carl Lang the seller received funds deposited into escrow and other damages including lawyer's fees, 1031 expenses and interest. Out of the approximately $2M raised by Diamandia Lingos and Pena about $1.3 was spent on other things. Several months ago, when Pena spoke to the bank funding the purchase of the Dripping Springs property he was the buyer. AUSA O'Brien told Pena the situation was complicated and he was not confident he had all of the information. The situation could spawn civil lawsuits.

Pena had a verbal agreement to compensate Wright after the Dripping Springs deal closed.

Pena has been upfront about the Dripping Springs situation with his family and investors.

Wright opened credit cards at American Express (AMEX), Chase, and U.S. Bank. The credit cards were sent to Wright's residence. Wright told Pena that he needed to show he had more liquidity to buy the Dripping Springs property. Pena trusted Wright because Wright had helped Pena get a loan in the past. Wright had Pena's financial and personal information from the earlier loan. Wright incurred approximately $103k on the AMEX account. Wright also tried to open a line of credit at another bank, but the bank employee stopped him. Wright told Pena he was going to pay Pena back for the American Express charges. Wright showed Pena a check for approximately $396k that Wright claimed he was going receive some funds from. A couple of weeks ago, Wright paid Pena approximately $49k of the $103k.

Wright used the credit cards that were in Pena's name or his entities names without authorization. Wright entered into a residential lease in Beverly Hills using Pena's name or misrepresenting his position in Pena's company. Wright never held a position in Pena's own companies. AUSA O'Brien told Pena that he may be a victim of fraud and he should consider hiring an attorney.

USAO_00075168

SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 6

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry ___05/30/2024___

John Pena, date of birth (DOB) ████████, was interviewed
telephonically. Also present during the interview was Assistant United
States Attorney Thomas Rybarczyk. Pena was familiar with the identity of the
interviewing Agents and the nature of the interview, Pena provided the
following information:

Pena knew and authorized Ryan Wright(Wright) opening lines of credit and
credit cards in his name as well as Pena's companies names. Wright told Pena
that Pena needed to show as much liquidity as possible to obtain financing
for the Mission Oaks Group Robles Ranch Dripping Springs (MOGRRDS) project.

Wright opened accounts at American Express (AMEX), Chase and US Bank.
Pena knew Wright was opening credit cards, but he wasn't tracking
which entities were being used to open the accounts. Wright was never
authorized to utilize the accounts to spend a single dollar especially for
personal expenses.

Prior to the Wright opening the credit accounts for liquidity, Wright
used Pena's or Pena's businesses credit cards for expenses. When Pena
discovered the charges, he confronted Wright. Wright told Pena he had made a
mistake and apologized.

When Pena's AMEX card was declined in Newport Beach, AMEX called him a
few minutes later and informed him the reason his card was declined. Pena
was informed that he owed over $100k and the charges were incurred by
Wright. Pena then called Wright to 3-way him into the call with AMEX because
Pena believed there was some kind of mistake. Wright admitted the charges
were incurred by him during the call. Pena believes the call was recorded by
AMEX.

Pena reviewed the charges on the accounts. Pena recalled finding a large
charge to an attorney on one of the credit cards. Pena googled the attorney
and discovered the attorney was a criminal defense attorney. Pena asked
Wright about the charge. Wright claimed the charge was for a land use
attorney working on the MOGRRDS project. When Pena challenged Wright's

Investigation on  05/28/2024  at  Santa Maria, California, United States (Phone)

File # ████████████                                      Date drafted  05/28/2024

by  Dieter F. Willkomm, ROUSSEVE MICHAEL J

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of (U) John Pena interview - 5/28/2024 _____ , On 05/28/2024 , Page 2 of 3

explanation, Wright told Pena that Pena didn't know how much money Wright had in the MOGRRDS project. Wright didn't want to bother Pena about the expense so he just charged it to Pena's card. Pena asked Wright to show him his financial records to prove how much money Wright invested into MOGRRDS. Wright was not able to show Pena how much money he had invested in MOGRRDS.

Wright tried to get a $250k line of credit for Pena at Mission Valley Bank. Wright was able to secure a $100k line of credit. Pena used the $100k to pay off the AMEX balance Wright had charged. Pena authorized Wright to use credit line. Wright paid $50k back using proceeds from a deal in Omaha.

Pena installed and financed a solar system on his residence. The solar company offered financing through a local bank to be paid off in installments. After the installation, the bank changed and the new bank called the loan and demanded immediate payment from Pena. Wright introduced Pena to a friend named Andy Last Name Unknown (Andy LNU) that specialized in repairing personal credit. Andy LNU paid off the solar loan. Pena later learned Wright arranged for Andy LNU to pay the solar loan with Andy LNU's own funds with the agreement Wright would pay Andy LNU back. Wright did not pay Andy LNU back resulting in a loss to Andy LNU.

Pena reviewed a five page email with the subject Fwd: Documents needed for application, dated 1/5/23. The email shows Wright opening accounts at US Bank to increase Pena's liquidity. Pena authorized Wright to open the accounts.

Pena reviewed email file entry _1225130891.eml. An email from AMEX changing the account email address from ryan@missionoaksgroup.com to ale@jpgroupla.com. Wright opened the AMEX account ending in 71001. After Pena found out that Wright was utilizing his credit card accounts he had his assistant Alejandra Gonzalez (Gonzalez) change the default email address to her email address.

Pena reviewed email file entry _2058265632.eml. Singlepoint is an account service that Pena decided not use. Wright was included in the email chain because Pena didn't want to cut off Wright completely. Wright was promising Pena that he was going to pay off the outstanding credit cards balances. Pena also needed Wright to close the MOGRRDS escrow. If the escrow closed, Pena thought Wright would have made enough to pay off his debts.

Pena reviewed email file entry _1338681333.eml. Email documenting Wright's $100k AMEX debt.

Pena reviewed email file entry _1507441220.eml. Email showing Wright failed payment to AMEX account. Wright's payments would often be returned

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of  (U) John Pena interview - 5/28/2024                          , On  05/28/2024  , Page  3 of 3

for lack of funds.

Pena reviewed email file entry _1465883632.eml. Email and spreadsheet sent to Wright documenting the outstanding balances Wright owed.

Pena reviewed email file entry _4053409384.eml. Email from Wright confirming the opening of the AMEX credit card. Pena was aware that Wright was opening the account.

When the FBI contacted Pena's cousin's boyfriend, Pena told Wright about the contact. Wright was concerned about the FBI. Wright told Pena that Wright would pay for an attorney for Pena's cousin's boyfriend. Wright wanted to pay for an attorney for Pena as well. Pena declined the offer telling Wright he had nothing to hide. Pena was almost certain that Wright mentioned that he got an attorney for the woman that previously owned Davy Crockett Estates LLC.

Pena is no longer involved with MOGRRDS project.